Todd M. Schneider (SBN 158253)
Kyle G. Bates (SBN 299114)
SCHNEIDER WALLACE
COTTRELL KONECKY
WOTKYNS LLP
2000 Powell Street, Suite 1400
Emeryville, California 94608
Tel: (415) 421-7100
Fax: (415) 421-7105
tschneider@schneiderwallace.com
kbates@schneiderwallace.com

Attorneys for GURMINDER SINGH and Putative
Class Members

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN JOSE DIVISION

| | |
|---|---|
| GURMINDER SINGH, Individually and On Behalf of Others Similarly Situated, <br><br> Plaintiff, <br><br> vs. <br><br> GOOGLE, INC., <br><br> Defendants. | Case No.: <br><br> **CLASS ACTION COMPLAINT** <br><br> JURY TRIAL DEMANDED |

Gurminder Singh, on behalf of himself and all other similarly situated, files this Class Action Complaint (the "Complaint") against Defendant Google, Inc. ("Google"). For his Complaint, Plaintiff alleges as follows:

## INTRODUCTION

1.      Google's AdWords Program ("AdWords") is a pay-per-click advertising program offered by Google to advertisers who  wish to have Google display their ads on the Internet.[1] Through AdWords, advertisers pay only when an Internet user clicks on their ads. This is known as Pay-Per-Click ("PPC") advertising.

2.      According to Google, "invalid [or fraudulent] clicks account for less than 10% of all clicks on AdWords ads."[2]

3.      Participation in AdWords is governed by the Google Inc. Advertising Program Terms (the "Agreement").

## THE PARTIES

4.      Prior to signing up for AdWords, Plaintiff Singh researched AdWords to determine whether to advertise his various businesses through Google.

5.      Based on this research, Plaintiff learned that Google promotes AdWords as an advertising program designed to provide cost-effective, targeted pay-per-click advertising on high-quality websites.

6.      Specifically, through his research, Plaintiff learned that Google promises to protect consumers from fraudulent clicks, including clicks originating from click bots, click farms, and other improper click methods, by maintaining a relationship between Google, advertisers and publishers. Google promises that this relationship is "built on trust," and ensures "relevant ads which create a good experience for users, and an accurate and reliable source of income which contributes to the success of their websites and business."

---

[1] Google displays AdWords ads on google.com, certain other Google properties (e.g. YouTube and Gmail), and websites and properties of third parties ("partners") who enroll in Google's AdSense Program ("AdSense"). For clicks on ads from AdSense partner properties, Google and its partners split the revenues generated from such clicks.

[2]      Google, *Ad Traffic Quality Resource Center, available at* https://www.google.com/intl/en_ALL/ads/adtrafficquality (last visited June 30, 2016).

7.    Based on this research, Plaintiff opened an AdWords account. Plaintiff began advertising with Google and accepted (by "clicking through") the Agreement in January 2008.

8.    There are two primary channels in which advertising through Adwords can be displayed:  The Google Search Network ("GSN") and the Google Display Network ("GDN").

9.    The Google Search Network ("GSN") is a group of search-related websites or applications where a user's AdWords-based ads can appear. When a user advertises on the GSN, their ad can show next to search results when someone searches with terms related to one of the user's keywords.

10.    Running ads on the GSN is the most common, well-known form of PPC advertising. The GSN has historically been the most effective compared to other marketing channels, because it targets an active searcher, who is on a mission to find a specific piece of information.

11.    The Google Display Network ("GDN") is a collection of websites—including specific Google websites like Google Finance, Gmail, Blogger, and YouTube—that show AdWords ads. The GDN also includes mobile sites and applications.

12.    According to Google, the GDN includes over 2 million sites that reach over 90% of global Internet users.

13.    For displaying ads with AdSense for GDN, website publishers receive 68 percent of the revenue recognized by Google in connection with the service, with Google retaining the remaining 32 percent. For AdSense for GSN, website publishers receive 51 percent of the revenue recognized by Google, with Google retaining the remaining 49 percent.[3]

14.    However, in early 2016 Plaintiff began to suspect his Google Display Network-based PPC advertisements were being clicked on by artificially-created, invalid clicks due to the anomalous click patterns that arose and which fit the descriptions used by Google to identify suspicious and potentially fraudulent click activity.

---

[3]    Google, *AdSense Help:   AdSense revenue share*, *available at* https://support.google.com/adsense/answer/180195?hl=en (last visited June 30, 2016).

15.    As a result, Plaintiff conducted a series of experiments to determine whether his Google Display Network advertisements were being fraudulently manipulated, and if so to calculate the extent of such fraud.

16.    Upon completion, Plaintiff's experiments revealed rampant, wide-spread invalid click activity on ads within Plaintiff's advertising campaign, at a rate between forty (40) and forty-eight (48) percent of total clicks on the Google Display Network, for each of which Google collects thirty-two percent of the total advertising proceeds. Across the entirety of AdWords' United States user base, these invalid clicks result in billions of dollars in additional profits for Google on an annual basis.

## PARTIES

17.    Plaintiff Singh is an individual who resides in Vacaville, California. Plaintiff began advertising through Google in 2008. Plaintiff incurred losses and has been injured by the actions of Google described herein.

18.    Defendant Google is a Delaware corporation with its principal place of business located at 1600 Amphitheatre Parkway, Mountain View, California 94043.

## JURISDICTION AND VENUE

19.    The Court has jurisdiction over this action pursuant to 28 U.S.C. §1332(d)(2). If a class is certified in this action, the amount in controversy will exceed $5,000,000.00, exclusive of interest and costs, and this is a class action in which at least one member of the Class is a citizen of a state different from any defendant. Although Google is located in California, the principal injuries resulting from Google's conduct have been incurred throughout the United States where Class members are located. On information and belief, greater than two-thirds of the members of the proposed Class are citizens of states other than California.

20.    This Court has general jurisdiction over Google. Google engages in continuous and systematic activities within the State of California. Indeed, Google's headquarters are located in Mountain View, California, which is within the jurisdiction of this Court.

FACTUAL ALLEGATIONS

**Google Policies Related to Fraudulent Clicks**

21.     Google defines an "invalid click" as, among other actions, "manual clicks intended to increase your advertising costs or to increase profits for website owners hosting your ads," as well as "clicks by automated clicking tools, robots, or other deceptive software."[4]

22.     Google represents that, "[w]hen Google determines that clicks are invalid, we try to automatically filter them from your reports and payments so that you're not charged for those clicks."

23.     In December 2014, *AdWeek* reported that digital advertising would take in $43.8 billion during the 2015 calendar year, and estimated that $6.3 billion of that would be based solely upon fraudulent activity.[5]

24.     False clicks are also generated by entities known as "click farms," another fraudulent form of generating click results that Google is aware of,wherein a large group of low-paid workers are hired to click on paid advertising links for the click fraudster.

25.     According to an article in the *Atlantic* from 2013, 60 percent of all Internet traffic is the result of bots, many of which consist of software that provides false ad views.[6]

26.     A "click bot" is a software program that can simulate the clicking of different ads on any Web page at any URL, at predetermined random intervals, whilst showing a different IP address

---

[4]     Google, *AdWords Help: Invalid Clicks*, *available at* https://support.google.com/adwords/answer/42995?hl=en (last visited June 30, 2016).

[5] Mediative.com, *How big of a problem is fraud in programmatic and what can advertisers and agencies do about it?*, *available at* http://www.mediative.com/problem-of-fraud-in-programmatic/ (last visited June 30, 2016).

[6] Daniel Larsson, Rank Ranger, *Click-Fraud a Multi-Billion Industry* (Oct. 12, 2015), *available at* https://www.rankranger.com/blog/click-fraud (last visited June 30, 2016).

each time. Specific examples include programs such as "Adwords Clicker Bot"[7] and "Zeus,"[8] which allows individuals to instruct infected machines to "do [their] bidding by having it open a hidden Internet Explorer window in the which the malware secretly visits websites and clicks on ads, all without the innocent user knowing what is going on."

27.   A "view bot," on the other hand, although similar in certain important respects to a click bot, generally operates on visual channels including sites such as YouTube and Twitch, wherein such bots are employed by users to automate views of embedded ads, generating millions of dollars in additional, fraudulent views.

28.   As a result of the ever-growing influence of click bots and view bots, online advertising has become "riddled" with fraud.[9]

29.   Within its "Ad Traffic Quality Resource Center – Overview," Google represents that, "[t]he relationship between Google, advertisers, and publishers is built on trust. Advertisers rely on the relevance of our ad placement, our reporting statistics, and the quality of the clicks their ads receive. Publishers in turn count on advertiser participation, relevant ads which create a good experience for users, and an accurate and reliable source of income which contributes to the success of their websites and business. We take this trust seriously and we know that the Google advertising networks couldn't exist without it."

30.   To protect AdWords users and its AdSense partners, Google represents that it has "a global team which is dedicated to staying on top of your concerns, monitoring traffic across Google's ad network, and preventing advertisers from paying for invalid traffic. While they provide protection

---

[7] BestMacros, *AdWords Clicker Bot* (Dec. 18, 2014), *available at* http://bestmacros.com/adwords-clicker-bot/ (last visited June 30, 2016).

[8] Jim Edwards, *This Is What It Looks Like When A Click-Fraud Botnet Secretly Controls Your Web Browser*, Business Insider (Nov. 27. 2013) *available at* http://www.businessinsider.com/this-is-what-it-looks-like-when-a-click-fraud-botnet-secretly-controls-your-web-browser-2013-11   (last visited June 30, 2016).

[9] Jim Edwards, *4 Ad Execs Just Admitted That Online Adtech Is Riddled With 'Fraud'*, Business Insider (Oct. 11. 2013) *available at* http://www.businessinsider.com/adtech-execs-say-online-advertising-is-riddled-with-fraud-2013-10 (last visited June 30, 2016).

1  without you needing to do anything, we also know you want to do whatever you can to ensure the

2  best performance for your ads. We have created this website to aggregate various resources that

3  help you learn about invalid clicks and maintain a successful AdWords or AdSense account."

4       31.    Although Google acknowledges that click fraud does occur, it assures users, like

5  Plaintiff, that "[t]he vast majority of all invalid clicks on AdWords ads are caught by our online

6  filters. These filters are constantly being updated and react to a wide variety of traffic patterns and

7  indications of click fraud attacks. On average, invalid clicks account for less than 10% of all clicks

8  on AdWords ads."

9  **AdWords and the Google Search and Display Networks**

10      32.    AdWords is an advertising service available by Google for individuals and businesses

11 who want to display ads on Google and its advertising networks. The AdWords program enables

12 businesses to set a budget for advertising and only pay when website users actually click on the ads,

13 or view 30 seconds of video for video in-stream ads.

14      33.    Under a section entitled "Why Google AdWords?" Google's website identifies for

15 specific bases, including: (1) Attract more customers; (2) Research the right people at the right time;

16 (3) Advertise locally or globally; and (4) If you need us, we're here.[10]

17      34.    The AdWords website further proclaims, "you only pay for results … [s]igning up for

18 Google AdWords is free. You only pay when someone clicks your ads to visit your website, or calls

19 you. In other words, when your advertising is working."[11]

20 **Google's Search Quality Raters Guidelines**

21      35.    Unlike Google's practice of being inherently inclusive with respect to websites on

22 which paid content (i.e. AdWords) may appear, Google's practice regarding its organic, user-

23 generated Web searches is highly exclusive.

24

25

---

26 [10]Google, *AdWords*, *available at*  www.google.com/adwords (last visited June 30, 2016).

27 [11] *Id*.

28

36.    In order to protect the validity of its organic search results, and evaluate the subjective quality of the websites which appear first, Google employs an algorithm which is defined through experimentation by quality raters operating under Google's Search Quality Raters Guidelines ("SQR Guidelines").[12]

37.    The SQR Guidelines are intended to ensure the value of organic searches through the Google website, and to protect individual users from web pages the Guidelines have identified as potentially dangerous and/or irrelevant.

38.    Further, the SQR Guidelines inform Google's quality raters that "[y]our ratings will be used to evaluate search engine quality around the world. Good search engines give results that are helpful for users in their specific language and locale."

39.    Generally, the SQR Guidelines create a procedure for generating Page Quality Ratings ("PQRs"), with an express goal of "evaluat[ing] how well the page achieves its purpose. Because different types of websites and webpages can have very different purposes, our expectations and standards for different types of pages are also different."

40.    One of the explicit factors referenced within Google's SQR Guidelines is "Negative Reputation." Specifically, the SQR Guidelines state that "[e]xtremely negative, malicious, or financially fraudulent reputation information should result in a **Lowest** rating. Credible negative (though not malicious or financially fraudulent) reputation is a reason for a **Low** rating, especially for a YMYL page."[13]

41.    The SQR Guidelines also allow Google's quality raters to utilize their subjective impressions in issuing PQRs, including websites that simply do not feel trustworthy, including "[p]ages or websites you strongly suspect are scams."

---

[12]    Google,    Search    Quality    Evaluator    Guidelines    *available    at* http://static.googleusercontent.com/media/www.google.com/en//insidesearch/ howsearchworks/assets/searchqualityevaluatorguidelines.pdf (last visited June 30, 2016).

[13] "YMYL" stands for "Your Money or Your Life," and is a phrase Google uses to identify websites that have the potential to influence your immediate well-being (e.g. physical or financial).

42.   Yet, despite having access to hundreds of thousands, if not millions, of PQRs developed by its quality raters, Google does not utilize PQRs to restrict AdWords or AdSense content from appearing on websites with even an excessively high risk of fraud.

43.   As a result, AdWords ads, especially those that appear on websites and webpages with low PQRs, are exposed to the risk of excessive click fraud and click farming by website owners who engage and induce third-parties to manufacture increased profits through fraudulent clicks. Google sells advertising real estate to customers like Plaintiff on the same websites that Google determines are risky using its SQR Guidelines.

44.   Due to the revenue sharing component of AdSense instituted by Google (32 percent retained for GDN content, 49 percent retained for GSN content), Google has a very limited incentive to reduce third-party click fraud, because it, like the third-party website publisher, benefits from each additional click, even if such click is fraudulent.

**How AdWords Works**

45.   In its simplest form, AdWords is designed to function on a PPC basis, with the advertiser that is willing to pay the highest PPC earning the most valuable location for its advertisement.

46.   Every time that someone completes a Google search, an AdWords auction is created. At that time, individual advertisers who have a keyword match to the specific search query are afforded an opportunity to compete in the auction. The actual level at which each advertiser competes is based primarily upon their individual Ad Rank.

47.   Generally, ads are placed in order on individual websites based primarily upon their Ad Rank, with the ad bearing the highest Ad Rank earning the top spot, and the other ads filling in the remaining spots by rank.

48.   What a single advertiser pays per ad is actually the lowest amount necessary to beat the Ad Rank of the competitor below them. This is called the discounter.

49.     Thus, in practice, if an advertiser is utilizing a keyword with a high Quality Score, that advertiser is not only paying the least amount possible for their position, but they are also increasing costs for their respective competitors.

**Plaintiff Singh's AdWords GDN Test**

50.     Plaintiff has used Google's AdWords platform since 2008, due to its keyword-specific nature and capacity for highly-targeted marketing related to his various business ventures.

51.     Generally, Plaintiff focuses a significant part of his advertising efforts on the GDN, utilizing in-stream and in-display video advertisements to engage potential consumers for ad-associated product offerings.

52.     In early 2016, Plaintiff began to suspect his GDN-based PPC advertisements were being fraudulently manipulated by third-party publishers/website owners.

53.     Plaintiff's suspicions regarding the propriety of the clicks on his AdWords ads were based on an increase in a number of total clicks on each ad coupled with a decrease in the number of attendant conversions associated with the overall increase.

54.     A "conversion" happens when someone clicks an ad and then takes an action that the advertiser has defined has valuable to their business, such as the completion of an online purchase, or a call to an associated business.[14]

55.     To confirm his suspicions, Plaintiff conducted a series of experiments to determine whether his GDN advertisements were being fraudulently manipulated, and, if so, calculate the extent of such fraud.

56.     Specifically, Plaintiff utilized the GDN to create four advertisements, in two pairs, one of which was a "Standard Ad," and the other of which was a "Experimental Ad." These advertisements were then monitored by Plaintiff over a confined period of time, to allow him to evaluate the rate of fraudulent clicks.

---

[14]     Google, *AdWords Help: Conversion*, *available at* https://support.google.com/adwords/answer/6365?hl=en (last visited June 30, 2016).

57.   As part of the first experiment, Plaintiff prepared a Standard Ad, targeted only towards individuals over the age of sixty-two (62), which directed clickers to http://reversemortgageconsultants.com ("RM Website"), and included the following information:

> 2016 Reverse Mortgage
> Pros & Cons of a Reverse Mortgage
> Over age 62? See if you qualify.

58.   For the associated Experimental Ad, Plaintiff employed the same restrictions and RM Website, but instead included the following, nonsensical text (collectively, the "First Experiment"):

> Belds Reverse
> Compare for 2016
> Get the facts today.

59.   In total, the First Experiment received 128 clicks, with the Standard Ad receiving 76 clicks, and the Experimental Ad receiving 52 clicks, resulting in a fraudulent click rate of forty (40) percent.[15] Notably, the Experimental Ad also generated zero engagement with the RM Website.

60.   For the second experiment, Plaintiff created a Standard Ad, targeted at only females between the ages of twenty-five (25) and sixty-five (65), which included the following information:

> Excellent Graphic Designs
> Local USA Artist Designs
> Custom Made Wedding Invites
> jonistringfield.com

61.   In the associated Experimental Ad, Plaintiff targeted the same demographic, but, once again, utilized nonsensical, made-up text (collectively, the "Second Experiment"):

> Welder b-tonis
> Welders we'll take your left over
> B-tonis and produce nice designs
> jonistringfield.com

62.   In total, the Second Experiment received 132 clicks, with the Standard Ad receiving 68 clicks, and the Experimental Ad receiving 64 clicks, resulting in a fraudulent click rate of forty-

---

[15] For ease of consideration, this percentage assumes that each of the clicks on the Standard Ad was legitimate, an assumption which is undoubtedly false.

1    eight (48) percent.[16] Once again, the Experimental Ad generated zero engagement with the click-

2    through website.

3        63.    Beyond confirming the falsity of Google's representations that "invalid [or fraudulent]

4    clicks account for less than 10% of all clicks on AdWords ads," the First and Second Experiments

5    demonstrate the large-scale impact of click bots, click farms, and other improper click methods

6    employed by third-party publishers and website owners, on AdWords and AdSense.

7        64.    As a direct result of its failure appropriately monitor and/or restrict AdWords and

8    AdSense advertisements, which appear on the GDN, Google has increased its profits by billions

9    each and every year.

10                           **C**LASS **A**CTION **A**LLEGATIONS

11       65.    Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure

12    23(a), (b)(3), and in the alternative b(2), on behalf of a proposed class consisting of the following:

13

14        All persons and entities throughout the United States who advertised through
         Google's AdWords program and paid for clicks on their Google AdWords
15        advertisement(s) at any time between and including June 1, 2012 and the day
         this Court certifies this action as a class action (the "Class Period"), where
16        such clicks originated from Google's Display Network and were fraudulent
         in that such clicks were completed by individuals or entities retained by third-
17        party publishers and/or website owners to increase AdWords-generated
         revenue through additional, improper clicks (the "Class").
18

19

20       66.    Plaintiff reserves the right to amend this class definition and, if deemed appropriate,

21    to subdivide the Class into subclasses.

22       67.    Plaintiff seeks to recover on behalf of himself and the Class, a sum of money that

23    equals the amount of revenue generated from fraudulent clicks on the GDN from which Google

24    promised – but failed – to protect Plaintiff and the Class, including, without limitation, clicks

25    originating from click bots, click farms and other improper PPC methods.

26    _____

27    [16] Again, this fraudulent click percentage assumes that each of the clicks on the Standard Ad was
     legitimate, an assumption which is undoubtedly false.

28    _____

68.   In addition, Plaintiff seeks an injunction to ensure that the misconduct described herein ends, without the threat of such conduct reoccurring in the future.

69.   Plaintiff is not seeking to recover charges for clicks occurring in connection with "Smart Pricing" as was the subject of *Woods v. Google, Inc.*, No. 11-cv-01263-EJD (N.D. Cal. Filed March 15, 2008).

70.   This action has been brought and may properly be maintained as a class action under Federal Rule of Civil Procedure 23, because there is a well-defined community of interest in the litigation and the proposed Class is easily ascertainable.

a.   **Numerosity**: The potential members of the Class as defined are so numerous, that joinder of all the members of the Class is impracticable.

b.   **Commonality**: There are questions of law and fact common to Plaintiff and the Class that predominate over any questions affecting only individual members of the Class. These common questions of law and fact include, but are not limited to:

i.   Whether Google breached the terms of its Agreement with Plaintiff and the Class;

ii.   Whether Google breached the implied covenant of good faith and fair dealing;

iii.   Whether Google violated California Business & Professions Code §§17200, *et seq.*;

iv.   Whether Google violated California Business & Professions Code §§17500, *et seq.*;

v.   Whether Google failed to utilize the SQR Guidelines to protect Plaintiff and the Class from fraudulent clicks;

vi.   Whether Google failed to protect Plaintiff and the Class from per-click overcharges associated with fraudulent clicks;

vii.   Whether Google's PQR information was sufficient to determine the reliability of websites maintained by third-party publishers;

viii.   Whether Google misrepresented that "[I]nvalid [or fraudulent] clicks account for less than 10% of all clicks on AdWords ads;"

ix.     Whether Google misrepresented that "[w]hen Google determines that clicks are invalid, we try to automatically filter them from your reports and payments so that you're not charged for those clicks;"

x.      Whether Google misrepresented that "The vast majority of all invalid clicks on AdWords ads are caught by our online filters. These filters are constantly being updated and react to a wide variety of traffic patterns and indications of click fraud attacks."

c.     **Typicality**: Plaintiff's claims are typical of the claims of the Class. Google's common course of conduct in violation of law as alleged herein has caused Plaintiff and proposed Class members to sustain the same or similar injuries and damages. Plaintiff's claims are thereby representative of and co-extensive with the claims of the Class.

d.     **Adequacy of Representation**: Plaintiff is a member of the Class, he does not have any conflicts of interest with other proposed Class members, and will prosecute the case vigorously on behalf of the Class. Counsel representing Plaintiff is competent and experienced in litigating large class actions, including those involving §17200 and § 17500. Plaintiff will fairly and adequately represent and protect the interests of the Class members.

e.     **Superiority of a Class Action**: A class action is superior to other available means for the fair and efficient adjudication of this controversy. Individual joinder of all proposed Class members is not practicable, and questions of law and fact common to the Class predominate over any questions affecting only individual members of the Class. Each proposed Class member has been damaged and is entitled to recovery by reason of Google's improper practices. Class action treatment will allow those similarly situated person to litigate their claims in the manner that is most efficient and economical for the parties and the judicial system. The injury suffered by each Class member, while meaningful on an individual basis, is not of such magnitude as to make the prosecution of individual actions economically feasible. Individualized litigation increases the delay and expense to all Parties and the Court. By contrast,

class action treatment will allow those similarly situated persons to litigate their claims in the manner that is most efficient and economical for the Parties and the judicial system.

71.     In the alternative, the Class may be certified because the prosecution of separate actions by the individual members of the Class would create a risk of inconsistent or varying adjudication with respect to individual members of the Class, and, in turn, would establish incompatible standards of conduct for Google.

**CAUSES OF ACTION**

**COUNT 1 – BREACH OF CONTRACT**

**(Failure to Prevent Fraudulent Third-Party Clicks)**

72.     Plaintiff hereby incorporates by reference all Paragraphs of the Complaint as if fully set forth herein.

73.     Plaintiff brings this cause of action on behalf of himself and the Class.

74.     Google and all Class members are or were parties to the Agreement that governs their AdWords advertising relationship.

75.     The Agreement was drafted by Google and is uniform as to every Class member.[17]

76.     In Section 7 of the Agreement, Google expressly agrees that "[c]harges are solely based on Google's measurements for the applicable Program, unless otherwise agreed to in writing."

77.     Total clicks are one of the measurements Google uses to calculate charges for clicks. As alleged *supra*, Google explicitly represented to Plaintiff and the Class that, invalid [or fraudulent] clicks account for less than 10% of all clicks on AdWords ads."

78.     Further, Google also represents that "[w]hen Google determines that clicks are invalid, we try to automatically filter them from your reports and payments so that you're not charged for those clicks."

---

[17] Google presents the Agreement to advertisers at the end of the AdWords sign-up and ad creation process. Advertisers have no ability to modify the terms of the Agreement. Advertisers have no bargaining power and Plaintiff and the members of the proposed class had no other alternative but to agree to the terms of the Agreement. The Agreement is thus a contract of adhesion.

79.   Thus, pursuant to the Agreement, Google had a legal obligation to protect Plaintiff and the Class from fraudulent third-party clicks, and the associated loss of ad-based revenue, which occurred on the GDN. This is a material term of the Agreement.

80.   Due to Google's failure to appropriately "measure" the total clicks generated through AdWords placements, Plaintiff and the Class suffered substantial overcharges, significant artificial increases and associated inflation in the price of their advertisements on the GDN.

81.   Plaintiff and the Class performed all conditions, covenants, and promises required be performed by Plaintiff and the Class in accordance with the the terms of the Agreement. All conditions precedent to Google's performance have occurred or have been satisfied.

82.   As set forth herein, Google breached the Agreement by failing to protect Plaintiff and the Class from GDN clicks which were outside of the targeted demographic, and which were also originated by click bots, click farms, and other improper click methods ("Fraudulent Clicks"), and which, therefore, under the terms of the Agreement, should never have been billed to Plaintiff or the Class.

83.   As a result of Google's breach, it was able to retain thirty-two (32) percent of the proceeds from each fraudulent click, with the defrauding third-party publishers and website owners retaining the remaining sixty-eight (68) percent.

84.   Google's breach is the direct, proximate, and producing cause of damages to Plaintiff and the Class.

85.   Because of Google's breach of contract alleged herein, Plaintiff and the Class should be made whole for all amounts Google overcharged them by failing to protect Plaintiff and the Class from Fraudulent Clicks.

**COUNT II – BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING**

86.   Plaintiff hereby incorporates by reference all Paragraphs of the Complaint as if fully set forth herein.

87.   Plaintiff brings this action on behalf of himself and the Class.

88.     Plaintiff brings this Count for Breach of the Implied Covenant of Good Faith and Fair Dealing in the alternative to Count I.

89.     The Agreement includes the covenant of good faith and fair dealing.

90.     Pursuant to this implied covenant, Google has a duty not to commit acts that would improperly deprive Plaintiff and the Class of the intended benefits of the Agreement.

91.     The principal benefit and purpose for which Plaintiff and the Class contracted was cost-effective, relevant, and targeted pay-per-click advertising. As it relates to this Count, Plaintiff and the Class specifically contracted for the benefit of being charged only for legitimate clicks, originated by individuals within a set geographic range and within a targeted demographic. The implied covenant imposes a duty on Google to ensure the advertisements purchased by Plaintiff and the Class accurately applied these "measurements" and were protected from fraudulent third-party manipulation.

92.     Google acted in bad faith and contrary to fair dealing by failing to apply appropriate "measurements" and protections to GDN clicks appearing in the accounts of Plaintiff and the Class. This resulted in Plaintiff and the Class being charged for Fraudulent Clicks. That is, Google charged Plaintiff and the Class an inflated price for GDN clicks that Google should have known, via the use of the SQR Guidelines, or other protocols, had no value. Google knew the value of these GDN clicks because it measures and maintains PQRs for all websites and properties displaying AdWords content. Google's conduct deprived Plaintiff and the Class of one of the intended benefits of the Agreement – being charged only for GDN clicks which were legitimate and within the targeted demographic.

93.     By failing to protect Plaintiff and the Class from Fraudulent Clicks, Google is disregarding its "measurements" to determine the total charge for such clicks, thereby resulting in artificially inflated overcharges.

94.     Further, Google controls the "ad auction," which is the process of determining which ads will be displayed on websites and at what prices. Google is given complete discretion to determine the charges per click and complete discretion to apply the advertiser's maximum bid

1    price. Thus, advertisers, like Plaintiff and the Class, depend on Google to deal with them fairly and

2    honestly. Google betrayed this trust, which was a bedrock principle of its sales pitch to the

3    advertisers like Plaintiff and the Class in the first place, for its own profit.  Google acted in bad faith,

4    and did not deal fairly or honestly with Plaintiff and the Class by charging them for Fraudulent

5    Clicks, which it knew or should have known, via the use of the SQR Guidelines, or other protocols,

6    had no value.

7         95.    Plaintiff and the Class performed all conditions, covenants, and promises required be

8    performed by Plaintiff and the Class in accordance with the terms of the Agreement. All conditions

9    precedent to Google's performance have occurred or have been satisfied.

10        96.    The foregoing facts constitute a violation of the covenant of good faith and fair

11   dealing.

12        97.    As a result of such conduct, Plaintiff and the Class have been deprived of the intended

13   benefits of the Agreement (cost-effective, pay-per-click advertisements originating from actual,

14   legitimate users) and have suffered, and continue to suffer, economic losses.

15        98.    Google's breach of the implied covenant is the direct, proximate, and producing cause

16   of damages to Plaintiff and the Class.

17        99.    Because of Google's breach of the implied covenant, Plaintiff and the Class should be

18   made whole for all amounts Google overcharged them by failing to protect Plaintiff and the Class

19   from Fraudulent Clicks.

20            **COUNT III – VIOLATION OF CAL. BUS. & PROF. CODE §§17200 *ET SEQ.***

21        100.  Plaintiff hereby incorporates by reference all Paragraphs of the Complaint as if fully

22   set forth herein.

23        101.  Google's acts and business practices, as alleged herein, constitute unlawful, unfair,

24   and fraudulent business practices in violation of California Business & Professions Code §§17200,

25   *et seq.*

26        102.  Plaintiff brings this cause of action on behalf of himself and the Class of similarly

27   situated advertisers. Plaintiff has standing to pursue this claim as Plaintiff has suffered injury in fact,

28

1    relied upon Google's deceptive representations, and lost money or property as a result of Google's

2    actions and/or inactions.

3         103.   Prior to contracting with Google to join the AdWords program, Plaintiff reviewed and

4    relied upon statements issued by Google to advertise and explain the AdWords program.

5    Specifically, Plaintiff reviewed and relied upon, without limitation, the following statements:

- "[I]nvalid [or fraudulent] clicks account for less than 10% of all clicks on AdWords ads."

- "When Google determines that clicks are invalid, we try to automatically filter them from your reports and payments so that you're not charged for those clicks."

- "The relationship between Google, advertisers, and publishers is built on trust. Advertisers rely on the relevance of our ad placement, our reporting statistics, and the quality of the clicks their ads receive. Publishers in turn count on advertiser participation, relevant ads which create a good experience for users, and an accurate and reliable source of income which contributes to the success of their websites and business. We take this trust seriously and we know that the Google advertising networks couldn't exist without it."

- "[Google has] a global team which is dedicated to staying on top of your concerns, monitoring traffic across Google's ad network, and preventing advertisers from paying for invalid traffic."

- "The vast majority of all invalid clicks on AdWords ads are caught by our online filters. These filters are constantly being updated and react to a wide variety of traffic patterns and indications of click fraud attacks."

18   All of the foregoing statements appeared in Google's AdWords Help Center website and were

19   reviewed by Plaintiff prior to Plaintiff's advertising with Google.

20        104.   Similarly, Plaintiff reviewed and reasonably relied upon Google's representations in

21   the Agreement that "charges are solely based on Google's measurements for the applicable

22   Program, unless otherwise agreed to in writing." Plaintiff understood "Google's measurements"

23   upon which charges were to be based to include protection from overcharges and artificial increases

24   created by Fraudulent Clicks.

25        105.   Plaintiff also reviewed and reasonably relied upon the foregoing statements in January

26   2008, prior to choosing to advertise with Google, opening his AdWords account, advertising

27   through the AdWords program, and paying for advertising as charged by Google. The foregoing

28

1    statements induced Plaintiff to advertise with Google. Had Plaintiff known these statements were

2    not true, he would not have advertised with Google.

3          106.   The statements upon which Plaintiff relied appeared in Google's AdWords Help

4    Center website; the very place Google expects its advertisers to turn for information about the

5    AdWords Program. Therefore, Plaintiff's reliance on such representations was reasonable.

6          107.   The foregoing statements were also accessible during the AdWords sign-up process

7    and the ad creation process. Google made these statements to Plaintiff in an effort to induce his

8    enrollment in AdWords, induce his creation of ads, and induce his payment of ad charges. Moreover,

9    Google continues to make all of these representations today on its website (the AdWords Help

10   Center) and in Plaintiff's online AdWords account. Additionally, Plaintiff received emails after his

11   enrollment in AdWords directing him to the AdWords Help Center for answers to any of his

12   questions. Plaintiff's reliance on such statements was therefore unquestionably reasonable.

13         108.   Google's representations were deceptive in violation of §17200 because they were

14   likely to deceive advertisers into believing that Google would, at a minimum, protect Plaintiff and

15   the Class from Fraudulent Clicks. Moreover, Google failed to disclose throughout the Class Period

16   to advertisers, including Plaintiff and the Class, that:

17

18         •      Google would fail to protect Plaintiff and the Class from Fraudulent Clicks.

19         •      Google would not apply its SQR Guidelines to protect Plaintiff and the Class from
                  Fraudulent Clicks.

20

21         •      Google would not apply its "measurements" to all charges appearing in Plaintiff's
                  and the Class' AdWords accounts. Specifically, Google failed to disclose that it

22                would continually charge Plaintiff and the Class for clicks with no actual value.

23         •      Google would artificially inflate charges – by not using its "measurements" – from
                  certain GDN websites and properties by incorporating extensive Fraudulent Clicks

24                into its pricing profile.

25

26   These were material omissions that, if disclosed, would have caused Plaintiff to not advertise (or

27   quit advertising) with Google.

28

109.   Contrary to its representations, Google failed to adequately protect Plaintiff and the Class from Fraudulent Clicks in the GDN.

110.   As a result of Google's deceptive conduct, Plaintiff and the Class expended money on advertising with Google that they otherwise would not have spent had Google not made these misrepresentations and omissions.

111.   Google's acts and business practices, as alleged herein, are also unfair in violation of §17200 because they offend established public policy and/or are immoral, unethical, oppressive, unscrupulous and/or are substantially injurious to consumers. There is no countervailing benefit of these acts and practices to consumers or competition. These acts and practices caused injuries that Plaintiff and the Class members could not have reasonably avoided because they were not informed that Google would knowingly fail to protect them from Fraudulent Clicks.

112.   Google's breach of contract is also unlawful in violation of §17200.

113.   Google's breach of the implied covenant of good faith and fair dealing is also unlawful in violation of §17200.

114.   Google's acts and business practices, as alleged herein, have caused injury to Plaintiff and the Class.

115.   Google maintains its headquarters and principal place of operations in California. The unfair, unlawful, and fraudulent conduct detailed herein emanates from Google's California headquarters. As such, Google is subject to §17200.

116.   Because Google violated California Business & Professions Code §§17200, *et seq.*, Plaintiff and the Class should be made whole for all amounts that Google overcharged them by failing to protect them from Fraudulent Clicks.

117.   Plaintiff, on behalf of himself and the Class, seeks an order of this Court awarding restitution, disgorgement, injunctive relief and all other relief allowed under §17200.

### COUNT IV – VIOLATION OF CAL. BUS. & PROF. CODE §§17500 *ET SEQ.*

118.   Plaintiff hereby incorporates by reference all Paragraphs of the Complaint as if fully set forth herein.

119.  As detailed herein, Google engaged in untrue and misleading advertising in violation of California Business & Professions Code §§17500, *et seq.*

120.  Plaintiff brings this cause of action on behalf of himself and the Class of similarly situated advertisers.

121.  Google's advertisements and promotions have the capacity, likelihood and tendency to deceive or confuse the public into believing Google would act consistently with its statements identified in Count III. In fact, as explained *supra*, Plaintiff reasonably relied upon—and was deceived and confused by—Google's statements. In reliance on these statements, among others, Plaintiff opened his AdWords account, advertised with Google, and paid for such advertising.

122.  Google's marketing and advertising materials were generally available to the public on Google's AdWords website throughout the Class Period.

123.  Google's marketing and advertising materials were false, misleading, and deceptive, in that consumers were not informed that Google does not protect them from Fraudulent Clicks on the GDN.

124.  At the time Google made and disseminated the marketing and advertising materials alleged herein, Google knew or should have known that the statements were untrue or misleading, and thus in violation of §17500.

125.  Because of Google's violations of California Business & Professions Code §§17500, *et seq.*, Plaintiff and the Class should be made whole for all amounts Google overcharged them by failing to adequately protect them from Fraudulent Clicks.

126.  Plaintiff, on behalf of himself and the Class, seeks an order of this Court awarding restitution, disgorgement, injunctive relief, and all other relief allowed under §17500.

## JURY DEMAND

127.  Plaintiff demands a trial by jury as to all issues so triable.

## PRAYER

FOR THE FOREGOING REASONS, Plaintiff Singh, individually, and on behalf of the Class, respectfully requests that the Court certify this action as a class action, with Plaintiff as class

1   representative and the undersigned counsel as class counsel, and enter an order of judgment against

2   Google in favor of the Class that:

3       a.   Declares that Google has breached its contractual obligations to Class Members;

4       b.   Awards actual damages to Class Members to fully compensate them for losses
             sustained as a direct, proximate, and/or producing cause of Google's breaches and
5            unlawful conduct;

6       c.   Awards restitution and disgorgement of all monies Google derived from Class
             members through the misconduct alleged above;
7

8       d.   Awards pre-judgment and post-judgment interest at the maximum allowable rates;

9       e.   Awards reasonable attorneys' fees and costs;

10      f.   Temporarily and permanently enjoins Google from engaging in the unlawful
             practices alleged herein; and
11

12      g.   Orders any such other and further relief as the Court deems just and proper to correct
             the wrongs done unto the Class.
13

14

15  Dated: July 1, 2016                        Respectfully submitted,

16

17                                             /s/  Kyle G. Bates

18                                             **SCHNEIDER WALLACE**
                                               **COTTRELL KONECKY WOTKYNS LLP**
19                                             Todd M. Schneider (SBN 158253)
                                               Kyle G. Bates (SBN 299114)
20                                             2000 Powell Street, Ste. 1400
                                               Emeryville, California 94608
21                                             Telephone: (415) 421-7000
                                               Facsimile: (415) 421-7105
22                                             tschneider@schneiderwallace.com
                                               kbates@schneiderwallace.com
23

24                                             -AND-

25                                             **SCHNEIDER WALLACE**
                                               **COTTRELL KONECKY WOTKYNS LLP**
26                                             Garrett W. Wotkyns (to appear *pro hac vice*)
                                               Michael C. McKay (to appear *pro hac vice*)
27                                             8501 North Scottsdale Road, Suite 270

28

Scottsdale, Arizona 85253
Telephone: (480) 428-0141
Facsimile: (866) 505-8036
gwotkyns@schneiderwallace.com
mmckay@schneiderwallace.com

-AND-

**EDGAR LAW FIRM LLC**
John F. Edgar (to appear *pro hac vice*)
Boyce N. Richardson (to appear *pro hac vice*)
1032 Pennsylvania Avenue
Kansas City, Missouri 64105
Telephone: (816) 531-0033
Facsimile: (816) 531-3322
jfe@edgarlawfirm.com
bnr@edgarlawfirm.com