1   DALE R. BISH, State Bar No. 235390
    SONAL MITTAL, State Bar No. 299222
2   WILSON SONSINI GOODRICH & ROSATI
    Professional Corporation
3   650 Page Mill Road
    Palo Alto, CA 94304-1050
4   Telephone: (650) 493-9300
    Facsimile: (650) 565-5100
5   Email: dbish@wsgr.com; smittal@wsgr.com

6   BRIAN WILLEN (admitted *pro hac vice*)
    WILSON SONSINI GOODRICH & ROSATI
7   Professional Corporation
    1301 Avenue of the Americas, 40th Floor
8   New York, NY 10019
    Telephone: (212) 999-5800
9   Facsimile: (212) 999-5899
    Email: bwillen@wsgr.com
10
    *Attorneys for Defendant*
11  *Google Inc.*

12

13                    UNITED STATES DISTRICT COURT

14                   NORTHERN DISTRICT OF CALIFORNIA

15                         SAN JOSE DIVISION

16

17  GURMINDER SINGH, Individually and On      )   CASE NO.: 5:16-cv-03734-BLF
    Behalf of Others Similarly Situated,       )
18                                             )   **GOOGLE INC.'S MOTION TO**
                  Plaintiff,                    )   **DISMISS PLAINTIFF'S SECOND**
19                                             )   **AMENDED COMPLAINT**
             v.                                 )
20                                             )   Date: March 30, 2017
    GOOGLE INC.,                                )   Time: 9:00 a.m.
21                                             )   Place: Courtroom 3, 5th Floor
                  Defendant.                    )   Before: Hon. Beth Labson Freeman
22                                             )
                                               )
23  _____   )

24

25

26

27

28

# TABLE OF CONTENTS

**Page**

NOTICE OF MOTION AND MOTION ................................................................................. 1

STATEMENT OF ISSUES .................................................................................................... 1

MEMORANDUM OF POINTS AND AUTHORITIES ........................................................ 1

I.      PRELIMINARY STATEMENT ................................................................................ 1

II.     FACTUAL AND PROCEDURAL BACKGROUND .............................................. 3

     A.     Google And Its AdWords Program ............................................................. 3

     B.     Google's Efforts To Limit Charges For Invalid Clicks ............................... 5

     C.     Plaintiff And His Claims Against Google .................................................... 7

III.    ARGUMENT .............................................................................................................. 8

     A.     Plaintiff Waived All Claims Arising From Charges For Allegedly Invalid Clicks That He Failed to Submit To Google Through The Claims Process ........... 9

          1.     The Agreement bars all claims that Plaintiff did not submit to Google through the claims process ................................................. 9

          2.     The contractual waiver that Plaintiff accepted is fair and enforceable ..... 11

     B.     Plaintiff Cannot State A Claim for Breach of the Implied Covenant .................... 12

          1.     Plaintiff cannot use the implied covenant to rewrite the parties' Agreement regarding fraudulent clicks ...................................... 13

          2.     Plaintiff does not plausibly allege that Google's actions regarding click fraud were unreasonable or done in bad faith .................................. 15

     C.     Plaintiff Fails To State A Claim Under The UCL ............................................. 17

          1.     Plaintiff cannot state a claim under the "unlawful" prong ...................... 17

          2.     Plaintiff cannot state a claim under the "unfairness" prong .................... 18

          3.     Plaintiff cannot state a claim under the fraud prong ................................ 19

               a.     Plaintiff cannot allege that the statements he claims to have relied on were actually false or deceptive ...................... 20

               b.     As a matter of law, Plaintiff could not have reasonably relied on any of the extra-contractual statements at issue ...................... 23

     D.     Plaintiff's Other Fraud Claims Fail For The Same Reasons As His UCL Claim ........................................................................................................ 24

IV.    CONCLUSION ........................................................................................................ 25

1

## <u>TABLE OF AUTHORITIES</u>

2

3

### CASES

4    *Agosta v. Astor*, 15 Cal. Rptr. 3d 565 (Cal. Ct. App. 2004).............................................13

5    *Ashcroft v. Iqbal*, 556 U.S. 662 (2009) ...............................................................8, 25

6    *Avila v. Countrywide Home Loans*, 2010 U.S. Dist. LEXIS 133701 (N.D. Cal. Dec.
          7, 2010)..........................................................................................13
7
     *Benefield v. Bryco Funding, Inc.*, 2014 U.S. Dist. LEXIS 113129 (N.D. Cal. Aug.
8         14, 2014).........................................................................................25

9    *Boland v. Rolf C. Hagen (USA) Corp.*, 685 F. Supp. 2d 1094 (E.D. Cal. 2010) ............17

10   *Careau & Co. v. Sec. Pac. Bus. Credit*, 272 Cal. Rptr. (Cal. Ct. App. 1990)...........15, 16

11   *Carma Developers, Inc. v. Marathon Dev. Cal., Inc.*, 826 P.2d 710 (Cal. 1992) .........13

12   *Cel-Tech Commc'ns, Inc. v. Los Angeles Cellular Telephone Co.*, 973 P.2d 527
          (Cal. 1999)......................................................................................18
13
     *Cullen v. Netflix, Inc.*, 2013 U.S. Dist. LEXIS 4246 (N.D. Cal. Jan. 10, 2013) .....22-23
14
     *Damabeh v. 7-Eleven, Inc.*, 2013 U.S. Dist. LEXIS 66565 (N.D. Cal. May 8, 2013)...........13
15
     *Daugherty v. Am. Honda Motor Co.*, 51 Cal. Rptr. 3d 118 (Cal. Ct. App. 2006)...........18
16
     *Davis v. HSBC Bank Nev.*, 691 F.3d 1152 (9th Cir. 2012) ...............................18, 19, 24
17
     *Ecological Rights Found. v. Pac. Gas & Elec. Co.*, 713 F.3d 502 (9th Cir. 2013) .........5
18
     *Fazio v. Apple, Inc.*, 637 F. App'x 415 (9th Cir. 2016) ..................................20
19
     *Feldman v. Google*, 513 F. Supp. 2d 229 (E.D. Pa. 2007)..................................12
20
     *Ford v. Lehman Bros. Bank, FSB*, 2012 U.S. Dist. LEXIS 85600 (N.D. Cal. June
21        20, 2012).........................................................................................18

22   *Free Range Content, Inc. v. Google*, 2016 U.S. Dist. LEXIS 64365 (N.D. Cal. May
          13, 2016)...............................................................................11, 12, 13
23                                                                                                    15

24   *GIA-GMI, LLC v. Michener*, 2007 U.S. Dist. LEXIS 54031 (N.D. Cal. July 16,
          2007)..............................................................................................25
25
     *Glen Holly Entm't v. Tektronix Inc.*, 343 F.3d 1000 (9th Cir. 2003) .......................20
26
     *Guido v. Koopman*, 2 Cal. Rptr. 2d 437 (Cal. Ct. App. 1991) .............................23-24
27
     *In re Facebook PPC Advert. Litg.*, 2010 U.S. Dist. LEXIS 136505 (N.D. Cal. Dec.
28        15, 2010)..........................................................................................24

*In re Google Privacy Policy Litig.*, 2013 U.S Dist. LEXIS 171124 (N.D. Cal. Dec. 3, 2013)..................................................................................................................20

*Janda v. T-Mobile, USA, Inc.*, 2009 U.S. Dist. LEXIS 24395 (N.D. Cal. Mar. 13, 2009)........................................................................................................................23

*Kearns v. Ford Motor Co.*, 567 F.3d 1120 (9th Cir. 2009)..........................................20

*Knievel v. ESPN*, 393 F.3d 1068 (9th Cir. 2005) .........................................................5

*Lazar v. Superior Court*, 909 P.2d 981 (Cal. 1996) ..................................................25

*Lovesy v. Armed Forces Benefit Ass'n*, 2008 U.S. Dist. LEXIS 97790, (N.D. Cal. Nov. 5, 2008)...................................................................................................8

*Nkwuo v. MetroPCS, Inc.*, 2015 U.S. Dist. LEXIS 111206 (N.D. Cal. Aug. 21, 2015)........................................................................................................................15

*Oestreicher v. Alienware Corp.*, 544 F. Supp. 2d 964 (N.D. Cal. 2008) ................20, 22

*Rhodes v. Omega Res., Inc.*, 38 F. Supp. 2d 1353 (S.D. Fla. 1999)............................25

*Rosado v. eBay, Inc.*, 53 F. Supp. 3d 1256, 1264-65 (N.D. Cal. 2014) .....................23

*Schmier v. U.S. Ct. of Appeals*, 279 F.3d 817 (9th Cir. 2002) ...................................8-9

*South Bay Chevrolet v. Gen. Motors Acceptance Corp.*, 85 Cal. Rptr. 2d 301 (Cal. Ct. App. 1999)...............................................................................................19

*Spiegler v. Home Depot U.S.A., Inc.*, 552 F. Supp. 2d 1036 (C.D. Cal. 2008)............23

*Sybersound Records, Inc. v. UAV Corp.*, 517 F.3d 1137 (9th Cir. 2008) ...................17

*Tollefson v. Roman Catholic Bishop*, 268 Cal. Rptr. 550 (Cal. Ct. App. 1990) ...........15

*Williamson v. Reinalt-Thomas Corp.*, 2012 U.S. Dist. LEXIS 58639 (N.D. Cal. Apr. 25, 2012) ........................................................................................................24

*Woods v. Google, Inc.*, 2011 U.S. Dist. LEXIS 88795 (N.D. Cal. Aug. 10, 2011) ..................15, 24

*Worley v. Avanquest N. Am., Inc.*, 2013 U.S. Dist. LEXIS 16239 (N.D. Cal. Feb. 5, 2013)........................................................................................................................25

## STATUTES

Cal. Bus. & Prof. Code § 17200.................................................................................17

Cal. Bus. & Prof. Code § 17204.................................................................................17

Cal. Bus. & Prof. Code § 17500.................................................................................24

## RULES

Fed. R. Civ. P. 9(b).............................................................................................20, 25

Fed. R. Civ. P. 12(b)(6)...................................................................................1, 8, 12

**NOTICE OF MOTION AND MOTION**

PLEASE TAKE NOTICE that on March 30, 2017 at 9:00 a.m., in the courtroom of the Honorable Beth Labson Freeman of the United States District Court for the Northern District of California, 280 South 1st Street, San Jose, Defendant Google Inc. ("Google") will and hereby does move the Court for an order dismissing Plaintiff's Second Amended Class Action Complaint ("SAC") pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure.

**STATEMENT OF ISSUES**

A.     Whether Section 7 of the AdWords Agreement applies here to bar any claims arising from charges for supposedly invalid clicks that Plaintiff failed to submit through Google's internal claims process.

B.     Whether Plaintiff fails to state a claim for breach of the implied covenant of good faith and fair dealing because the parties' Agreement includes no promise that Google will protect advertisers from being charged for fraudulent clicks and because Plaintiff fails to plausibly allege that Google acted unreasonably or in bad faith.

C.     Whether Plaintiff fails to state a claim under the Unfair Competition Law ("UCL") because Google's alleged conduct was not unlawful or unfair.

D.     Whether Plaintiff fails to state a fraud claim under the UCL, a claim under the False Advertising Law ("FAL"), and/or a claim for fraudulent inducement because the SAC fails to plausibly allege that the Google statements at issue were false or misleading and that Plaintiff reasonably relied on those statements.

**MEMORANDUM OF POINTS AND AUTHORITIES**

**I.     PRELIMINARY STATEMENT**

AdWords is an online advertising platform that allows advertisers to display ads on various Google services and other websites. This case involves allegations of "click fraud" in connection with pay-per-click ads displayed through AdWords. Google takes click fraud seriously and has implemented numerous measures to protect advertisers against it. Those include sophisticated filtering systems that aim to block invalid clicks, as well as a claims

1  process that allows advertisers to report suspicious activity at the time it happens and receive

2  credits for charges determined to result from invalid clicks.

3      Plaintiff has been an AdWords advertiser since 2008. When he joined the AdWords

4  program, Plaintiff accepted the "Google Inc. Advertising Program Terms" (the "AdWords

5  Agreement" or "Agreement"), the contract that governs the relationship between Google and its

6  advertisers. Nothing in the AdWords Agreement promises that Google would prevent all

7  instances of click fraud. To the contrary, Section 7 of the Agreement specifically informed

8  Plaintiff that third parties may "generate impressions or clicks on [his] Ads for prohibited or

9  improper purposes" and that Google has a claims process that advertisers can use to resolve any

10  charges that may result from such activity.

11      Notwithstanding the clear language of the governing Agreement, Plaintiff now brings this

12  putative class action against Google for supposedly failing to do enough to protect him from

13  click fraud. This is now Plaintiff's third effort to state a claim. Without identifying a single

14  instance in which Google actually charged him for fraudulent or invalid clicks, Plaintiff's SAC

15  asserts that Google has breached the implied covenant of good faith, engaged in unfair business

16  practices, and fraudulently induced him into participating in the AdWords program.

17      Plaintiff's effort to hold Google liable across the board for every advertising charge

18  supposedly connected with an invalid click runs headlong into the AdWords Agreement. When

19  he accepted the Agreement, Plaintiff expressly agreed to waive any claims regarding advertising

20  charges that he had not first submitted to Google within 60 days of the relevant invoice. This

21  claims process allows Google to investigate disputed charges, determine whether an advertiser's

22  concerns have merit, and award advertising credits where charges are found to result from

23  invalid click activity. Plaintiff does not (and cannot) allege that he used that claims process to

24  bring charges to Google's attention for the overwhelming majority of the supposedly invalid

25  clicks for which he now seeks redress. Plaintiff cannot evade the consequences of that decision

26  by belatedly calling the claims process "illusory." The Agreement requires the Court to dismiss

27  any claims based on charges that Plaintiff did not previously submit to Google within 60 days.

28

Even beyond this express waiver, Plaintiff's claims fail. The claim for breach of the implied duty of good faith improperly seeks to rewrite the parties' Agreement to impose an obligation on Google to protect advertisers against all instances of click fraud—an obligation the Agreement expressly disclaims. Moreover, Plaintiff cannot plausibly allege that Google acted in bad faith to cause Plaintiff to be charged for invalid or fraudulent clicks. Plaintiff's UCL, FAL, and fraudulent inducement claims fail because the allegations in the SAC do not support the conclusion that Google acted unfairly, in violation of the law, or fraudulently. Plaintiff's unfairness claim is boilerplate, while his unlawfulness claim is based solely on an alleged breach of an implied contractual covenant that cannot support such a claim. As for fraud, it is clear from the face of the complaint that none of the extra-contractual statements Plaintiff points to is deceptive, and in light of the specific terms of the Agreement, Plaintiff could not, as a matter of law, have reasonably relied on those statements.

## II.  FACTUAL AND PROCEDURAL BACKGROUND

### A.  Google And Its AdWords Program

Google is an online service provider, whose offerings include various online advertising programs. This case arises from AdWords, an online platform that Google makes available for advertisers to have their ads displayed on various Google properties, including Google Search and YouTube, and other websites. SAC ¶¶ 1, 23. As relevant here, the ads displayed through AdWords are "pay-per-click" ads. *Id*. ¶ 1. Advertisers pay for such ads when they are clicked on and redirected to the advertised website, and they are generally billed on a per-click basis until an advertiser reaches its designated budget. *Id*. ¶ 23.

The relationship between Google and AdWords advertisers is governed by the AdWords Agreement. SAC ¶ 10. Plaintiff is a party to this Agreement, which he accepted when he signed up for an AdWords account in January 2008. *Id*. ¶ 14. Plaintiff alleges that the February 21, 2013 version of the AdWords Agreement ("2013 Agreement") is the operative contract between the

parties. SAC ¶ 10; First Amended Complaint ("FAC"), Dkt. 14, ¶ 3, Ex. A (attaching 2013 Agreement).[1] That Agreement includes several provisions that bear directly on this case.

*First*, the Agreement specifically anticipates that invalid clicks may happen and may result in charges to advertisers, and it provides a specific remedial process for handling any such charges. Section 7 states: "Customer understands that third parties may generate impressions or clicks on Customer's ads for prohibited or improper purposes." SAC ¶ 78 (citing Ex. 1 § 7). If advertisers suspect that third parties are generating fraudulent or invalid clicks on their ads, they can report suspicious charges to Google within 60 days of invoicing (the "Claim Period") and receive ad credits. Ex. 1 § 7. This claims process represents the advertiser's "sole remedy" for claims relating to advertising charges. *Id*. Advertisers expressly waive "ALL CLAIMS" for charges that are not submitted to Google within the Claim Period. *Id*.

*Second*, the Agreement makes clear to advertisers that there are no extra-contractual guarantees associated with the AdWords program. It does so through a disclaimer provision that explains, in all caps, that "THE PROGRAMS AND GOOGLE AND PARTNER PROGRAMS ARE PROVIDED 'AS IS' AND AT CUSTOMER'S AND ADVERTISER'S OPTION AND RISK AND NONE OF GOOGLE, ITS AFFILIATES OR GOOGLE PARTNERS MAKE ANY GUARANTEE IN CONNECTION WITH THE PROGRAMS OR PROGRAM RESULTS." Ex. 1 § 8. That is, Google expressly disclaims any promise regarding the validity or quality of "clicks" that an advertiser may receive, or the results that an advertiser may obtain. The Agreement also includes an integration clause that makes clear that the written contract represents the parties' "entire agreement" and "supersede[s] any prior or contemporaneous agreements on that subject." Ex. 1 § 12(c).

---

[1] While the 2013 Agreement was an exhibit to the FAC, Plaintiff omitted it from the SAC. For the Court's convenience, Google attaches a copy of that Agreement here, as Exhibit 1 ("Ex. 1") to the accompanying Declaration of Dale R. Bish ("Bish Decl."). For purposes of this motion, Google accepts Plaintiff's allegation that the 2013 Agreement is the operative version. But because Plaintiff created his AdWords account in 2008, a prior version of the AdWords Agreement, dated August 22, 2006 (the "2006 Agreement"), may also be relevant. *See* Bish Decl., Exhibit 2 ("Ex. 2") (attaching 2006 Agreement). The two versions of the Agreement are materially indistinguishable with respect to the issues in this Motion.

**B.      Google's Efforts To Limit Charges For Invalid Clicks**

This case involves allegations about fraudulent or invalid clicks by third parties on the AdWords platform. Google uses the term "click fraud" to refer to clicks generated with malicious or fraudulent intent. Bish Decl., Exhibit 3 ("Ex. 3") at 1-2.[2] "Invalid" clicks are clicks that Google considers to be illegitimate because they appear to be accidental, duplicative, the result of malicious software, or otherwise fraudulent. *Id.*

Plaintiff does not identify any individuals or entities that he believes are responsible for click fraud or that have caused invalid charges to occur in connection with his AdWords accounts. He has not brought claims against any of those alleged fraudsters. Instead, Plaintiff seeks to proceed solely against Google on the theory that Google did not take sufficient action to prevent third parties from abusing Google's systems by generating fraudulent clicks.

Just from the SAC, however, and the public-facing materials incorporated by reference into that pleading, it is clear that Google has implemented a range of solutions to address click fraud and limit its effects on AdWords advertisers. Google has a "global team which is dedicated to staying on top of [advertisers'] concerns, monitoring traffic across Google's ad network, and preventing advertisers from paying for invalid traffic." SAC ¶ 46. This team uses a complex array of filtering systems that monitor for and detect instances of click fraud. When Google's systems identify suspicious click patterns or behaviors, those clicks are excluded, often before advertisers are charged for them. *See* Ex. 3 at 3-4; Ex. 5 at 1-2.[3]

---

[2] Throughout the SAC, Plaintiff quotes, refers to, and expressly relies on statements from Google's online Ad Traffic Quality Resource Center, AdWords Help Center, and Inside AdWords blog. SAC ¶¶ 36, 47, 82 & n.24, 92(b)(x)-(xii), 110, 112, 126. The public-facing webpages on which these statements appear thus are incorporated into the SAC and properly considered by the Court in connection with this Motion. *See Ecological Rights Found. v. Pac. Gas & Elec. Co.*, 713 F.3d 502, 511 (9th Cir. 2013); *Knievel v. ESPN*, 393 F.3d 1068, 1076 (9th Cir. 2005). For the Court's convenience, Google has provided copies of those pages with this Motion. *See* Ex. 3, Ad Traffic Quality Resource Center, https://www.google.com/ intl/en_ALL/ads/adtrafficquality/ index.html; Bish Decl., Exhibit 4 ("Ex. 4"), AdWords Help Center: Invalid Clicks, https://support.google.com/adwords/answer/42995?hl=en; Bish Decl., Exhibit 5 ("Ex. 5"), Inside AdWords: Invalid Clicks – Google's Overall Numbers, https://adwords.googleblog.com/2007/02/invalid-clicks-googles-overall-numbers.html.

[3] The SAC refers in various places to Google's Search Quality Raters ("SQR") Guidelines and to Page Quality Ratings "PQRs." SAC ¶¶ 52-55, 92(b)(vii), 92(b)(ix), 99, 101, 115. Plaintiff acknowledges, however, that these policies relate exclusively to Google Search. *Id.* ¶¶ 51-52 (SQR Guidelines and PQRs are "intended to ensure the value of organic search results through

(continued...)

1   While these proactive systems catch a significant quantity of invalid clicks, they do not

2   catch everything. This is explained to advertisers by Google's public-facing statements and by

3   the AdWords Agreement itself, which make clear that despite Google's efforts, some invalid

4   clicks may result in charges. Ex. 3 at 3 ("Undoubtedly, some portion of the invalid click activity

5   is not detected by our proactive systems and processes"); SAC ¶ 78 (citing Ex. 1 § 7). While

6   these statements refute any suggestion that Google promises advertisers they will never be

7   charged for potentially invalid clicks, advertisers are not without recourse should that happen.

8   Google has a reactive process in which it investigates claims brought to its attention by

9   advertisers and issues credits for charges it determines to have been based on invalid clicks. SAC

10  ¶¶ 77-80. This claims process is described in the Agreement (Ex. 1 § 7) and in the materials that

11  Plaintiff references in the SAC. *See* Ex. 3 at 3-4; Ex. 4; Ex. 5 at 2. Although this process catches

12  and "[a]ccounts for a much smaller proportion of invalid clicks than that detected by [Google's]

13  automatic filters" (Ex. 3 at 4; *see also* Ex. 5 at 4-5), it is an important part of Google's efforts to

14  combat click fraud and to provide redress to advertisers who might be affected by it.[4]

15  The clicks identified by the combination of Google's proactive and reactive systems are

16  what Google describes as "invalid traffic," i.e., "clicks and impressions on AdWords ads ***that***

17  ***Google suspects*** to not be the result of genuine user interest." Ex. 3 at 1 (emphasis added). That

18  does not mean, of course, that *all* instances of what may be invalid clicks are necessarily

19  detected. No system could possibly make such a guarantee. If Google's algorithms do not detect

20

21

                     (...continued from previous page)

22  the Google website" and used to "evaluate search engine quality around the world"). As discussed below, Plaintiff does not (and cannot) allege these Guidelines have any connection to

23  the AdWords program, and he offers nothing beyond his own conclusory belief to suggest that they would be useful to prevent click fraud in that context.

24  [4] Google publishes information about the overall volume of invalid click activity it detects

25  across the AdWords platform. *See* Ex. 3; Ex. 4; Ex. 5. Plaintiff references this information in the SAC (¶ 82 & n.24). In these statements, Google makes clear that "the network-wide invalid

26  clicks rate is separate from an individual advertiser's invalid clicks rate." Ex. 5 at 5. Indeed, because "the overall invalid clicks rate, as well as its day-to-day fluctuations, has almost no

27  relation to the invalid clicks rate for an individual advertiser," Google takes pains to explain "***these network figures do not have any bearing on what individual advertisers may***

28  ***experience***, and you should refer to your invalid clicks report for that data." *Id*. at 6 (emphasis added).

1   an invalid click, and advertisers do not bring what they believe to be charges based on such

2   clicks to Google's attention, those charges may never be fully investigated or identified.

3       **C.     Plaintiff And His Claims Against Google**

4       Plaintiff Gurminder Singh alleges that he is a small-business owner who signed up for an

5   AdWords account in January 2008. SAC ¶¶ 11, 14, 19. Plaintiff acknowledges that he consented

6   to the AdWords Agreement by clicking through the Agreement when he created his account. *Id.*

7   ¶ 14. Plaintiff alleges he has continued to use AdWords since that time, and now manages three

8   separate AdWords accounts, because the program offers "keyword-specific" and "highly-

9   targeted" advertising opportunities for his "various business ventures." *Id.* ¶¶ 57, 59.

10  Plaintiff alleges that in "early 2016," he began to suspect that certain of his advertisements "were

11  being fraudulently manipulated by third-party publishers/website owners." *Id.* ¶ 60. There is no

12  indication in the SAC that Plaintiff ever reported concerns about these clicks to Google or sought

13  Google's assistance in identifying the third parties responsible for this purported misconduct.

14  Indeed, the SAC does not identify *any* specific instance in which Plaintiff was supposedly

15  charged by Google for fraudulent or invalid clicks.

16      Plaintiff instead alleges that he conducted two "unsophisticated" "experiments" to

17  "determine whether his GDN advertisements were being fraudulently manipulated." *Id.* ¶¶ 56,

18  63. He created two pairs of advertisements, in which one ad was a "Standard" ad and the other ad

19  was "Experimental" and contained irregular language. *Id.* ¶¶ 64-71. Plaintiff makes the

20  (unsupported) assumption that all reported clicks on the Experimental ads with the irregular text

21  were invalid while all reported clicks on the Standard ads were legitimate. *Id.* ¶¶ 68, 71. Based

22  solely on these fake ads, Plaintiff claims that the rate of click fraud on AdWords is upwards of

23  35-50%. *Id.* ¶¶ 68, 71-72. Plaintiff did not share his "findings" with Google. He did not request

24  ad credits for any charges associated with the Experimental ads—in fact, Plaintiff does not allege

25  that he was even charged for such clicks. Nor did he stop using AdWords.

26      Instead, Plaintiff commenced this lawsuit against Google. Both the original complaint

27  and the FAC ignored Section 7 of the Agreement, in which Plaintiff specifically agreed to waive

28  all claims related to advertising charges that he had not raised with Google through the internal

1   claims process. On October 24, 2016, Google moved to dismiss the FAC because, among other

2   reasons, Plaintiff had not alleged that he ever submitted claims to Google regarding charges for

3   purportedly invalid clicks. Dkt. 32. Rather than oppose Google's motion, Plaintiff filed the SAC

4   on November 23, 2016. While the SAC for the first time acknowledges Section 7's waiver

5   provision, Plaintiff attempts to avoid it by declaring Google's claims process "illusory." SAC

6   ¶¶ 77-86. Notably, however, the SAC does not allege that Google never issues credits to

7   advertisers through this process or that Plaintiff himself has never received advertising credits.

8   Plaintiff points to a single instance, in May 2015 (before he began suspecting click fraud), when

9   he contacted Google regarding "suspicious charges" and Google investigated and found that the

10   clicks "appear[ed] to fit a normal pattern of user behavior." SAC ¶¶ 85-86. Plaintiff does not

11   allege or plead any facts suggesting that these clicks were actually fraudulent or that Google's

12   conclusion that they were legitimate was incorrect.

13        Beyond Plaintiff's effort to evade Section 7, the SAC asserts four causes of action against

14   Google: (1) breach of the implied covenant of good faith and fair dealing; (2) violation of the

15   UCL; (3) violation of the FAL; and (4) fraudulent inducement. *Id*. ¶¶ 94-138. In response to

16   Google's first motion to dismiss, the SAC dropped the breach of contract claim that was included

17   in the FAC. Plaintiff also purports to bring his claims on behalf of a putative class of AdWords

18   advertisers who paid for clicks originating from the Google Display Network since June 1, 2012.

19   *Id*. ¶ 87.

20   **III.    ARGUMENT**

21        Under Fed. R. Civ. P. 12(b)(6), "'[t]he court may dismiss a complaint as a matter of law

22   for (1) lack of a cognizable legal theory or (2) insufficient facts under a cognizable legal claim.'"

23   *Lovesy v. Armed Forces Benefit Ass'n*, 2008 U.S. Dist. LEXIS 97790, at *5 (N.D. Cal. Nov. 5,

24   2008) (citation omitted). Because "only a complaint that states a plausible claim for relief

25   survives a motion to dismiss[,]" "[t]hreadbare recitals of the elements of a cause of action,

26   supported by mere conclusory statements, do not suffice." *Ashcroft v. Iqbal*, 556 U.S. 662, 678-

27   79 (2009). A court thus need not accept conclusory allegations or unwarranted inferences as true.

28

1  *Schmier v. U.S. Ct. of Appeals*, 279 F.3d 817, 820 (9th Cir. 2002). Applying these standards, the

2  claims alleged in the SAC fail as a matter of law.

3      **A.**       **Plaintiff Waived All Claims Arising From Charges For Allegedly Invalid**

4                      **Clicks That He Failed to Submit To Google Through The Claims Process**

5          Plaintiff's claims in this case seek to recover damages for all advertising charges that

6  might have been made to his AdWords account based on fraudulent or invalid clicks. SAC

7  ¶¶ 106, 122, 130, 138. Those claims are barred by the clear terms of the AdWords Agreement.

8              **1.**        <u>The Agreement bars all claims that Plaintiff did not submit to Google</u>

9                          <u>through the claims process</u>

10          Plaintiff acknowledges that he accepted the Agreement and that it governs his

11  relationship with Google as an AdWords advertiser. SAC ¶¶ 10, 14. Section 7 of the Agreement

12  puts advertisers on notice that some clicks on their ads might be invalid and may not be detected

13  by Google's systems. SAC ¶ 78. And the provision creates a simple process for advertisers to use

14  if they believe that they have been charged for invalid clicks. It instructs them to "make a claim

15  for advertising credits within the Claim Period [60 days following the relevant invoice], after

16  which Google will issue the credits following claim validation which must be used by the Use

17  By Date." *Id.* (quoting Ex. 1 § 7). This process benefits both advertisers and Google. It gives

18  advertisers a streamlined method for reporting invalid clicks and for receiving credits for any

19  resulting charges. And it provides Google with certainty that any disputes relating to invalid

20  clicks will be presented promptly in a forum that allows for their efficient resolution.

21          Section 7 also clearly spells out the consequences of failing to submit claims to Google

22  through this process: "TO THE FULLEST EXTENT PERMITTED BY LAW, (A)

23  ADVERTISER AND CUSTOMER WAIVE ALL CLAIMS RELATING TO ANY PROGRAM

24  CHARGES UNLESS A CLAIM IS MADE WITHIN THE CLAIM PERIOD...." Ex. 1 § 7.

25  Accordingly, by entering into the Agreement, Plaintiff expressly agreed to waive any claims

26  relating to charges resulting from purportedly invalid or fraudulent clicks that he did not bring to

27  Google's attention within 60 days of the relevant invoice. *Id.* By its terms, this waiver applies

28

1   here: the claims asserted in the SAC are all "claims relating to … program charges." *See id*. § 1

2   (defining "Programs").

3       Although Plaintiff is clearly aware of this claims process (SAC ¶ 78), the SAC does not

4   even try to claim that Plaintiff used it for the overwhelming majority of the charges that he has

5   put at issue in this case. The only specific instance which Plaintiff claims to have brought to

6   Google's attention was on May 18, 2015, when "Plaintiff contacted Google regarding

7   'suspicious clicks' occurring on the 6829 account." SAC ¶ 85. Notably this was before the time

8   (in "early 2016") when Plaintiff says he first began to suspect that there was an issue with click

9   fraud on his account. *Id*. ¶ 60. Even with respect to the May 2015 communication, however,

10  Plaintiff does not allege that he submitted this claim to Google within the defined "Claim

11  Period." Indeed, the SAC offers no information at all about what, if any, charges Plaintiff might

12  have complained about, what the basis was, or the outcome of his claims (i.e., whether he in fact

13  received a credit). Other than this cursory reference to one communication with Google, Plaintiff

14  points to no specific occasion when  he used the claims process to bring disputed charges to

15  Google's attention, let alone within 60 days of the relevant invoice. The SAC does not identify a

16  single charge or invoice that Plaintiff contested on the grounds that there were fraudulent clicks,

17  and Plaintiff makes no allegation that he ever sought credits from Google for such charges.

18      In short, although Plaintiff's claims run from June 2012 to June 2016 (which includes 48

19  monthly invoices for each of Plaintiff's accounts), there is no basis in the SAC for concluding

20  that *any* of those charges—save for the possible exception of those allegedly challenged in May

21  2015—were ever brought to Google's attention or that Google was given an opportunity to

22  investigate those charges under the claims process set out in the parties' Agreement. Instead,

23  with respect to all those charges, Plaintiff now seeks to bypass the contractually mandated

24  mechanism for addressing potentially invalid clicks by suing Google in federal court. That is not

25  permissible. Under the Agreement, Plaintiff waived any judicial claims for charges that he failed

26  to submit to Google within the relevant Claim Period. That includes nearly all (if not all) of the

27  charges for supposedly invalid clicks that are the focus of the SAC.

28

1        This Court's recent ruling in *Free Range Content, Inc. v. Google*, 2016 U.S. Dist. LEXIS

2   64365, at *33-40 (N.D. Cal. May 13, 2016), is directly on point. That case involved a similar

3   provision in Google's AdSense Agreement under which "a publisher waives any payment-

4   related claim by failing to dispute the payment or withholding within 30 days." *Id.* at *35. The

5   Court concluded that "30 days is a reasonable amount of time in which to notify Google of a

6   dispute" (*id.* at *39) and dismissed all claims that the relevant plaintiffs failed to submit to

7   Google within the time provided by the agreement. *Id.* at *39-40. As in *Free Range*, Plaintiff's

8   failure to use the process provided for in the parties' governing agreement "bars [those] claims in

9   their entirety."

10              2.    The contractual waiver that Plaintiff accepted is fair and enforceable

11        After ignoring Section 7 in the prior versions of his complaint, Plaintiff now seeks to

12   avoid the consequences of his failure to use the claims process by alleging that Google's process

13   is somehow "illusory" and thus can be ignored at will. SAC ¶¶ 80-81. This effort fails.

14        As an initial matter, the fact that Google does not always find evidence of click fraud

15   when it investigates claims (SAC ¶¶ 80, 83, 86) does not remotely suggest that the process is

16   illusory. Indeed, that is exactly how things are supposed to work: not every claim is valid and not

17   every disputed charge is the result of click fraud or improper behavior. Plaintiff certainly does

18   not (and could not) allege that Google never issues credits in response to claims or that it denies

19   claims that it knows to have merit. Instead, the SAC says only that the issues Plaintiff brought to

20   Google's attention were found not to have merit. That does not plausibly suggest that the process

21   is illusory.[5]

22        Beyond that, the fact that Google has discretion about whether to grant or reject claims is

23   not a basis for disregarding the waiver that applies when an advertiser fails to submit a claim at

24   all. Where a claim is made to Google during the Claim Period, and Google declines to issue

---

26     [5] Plaintiff suggests that "AdWords participants have no meaningful or effective way of identifying fraudulent clicks on their legitimate ads." SAC ¶ 80. Even if that were so, it would

27   not undermine the validity of the claims process. But that allegation is contrary to Plaintiff's whole theory of the case, which is that he knows better than Google how to detect and prevent click fraud and that his "unsophisticated" anecdotal experiments demonstrate a much higher rate

28   of invalid clicks than Google's systems have found. *Id.* ¶¶ 51-75.

1    advertising credits, the advertiser has done what is required to avoid Section 7's waiver.

2    Google's denial of the claim does not leave the advertiser without recourse if the advertiser later

3    wants to pursue litigation regarding the disputed charges. But what is not allowed is what

4    Plaintiff seeks to do here: to decline to bring AdWords charges to Google's attention within 60

5    days (thus depriving Google of the chance to investigate the claim while it is fresh) and then turn

6    around and sue Google for those same charges. Plaintiff has no way of knowing whether he

7    would have received advertising credits for charges that he never submitted to Google. His

8    decision to avoid the claims process is not a reason to ignore the parties' Agreement. To the

9    contrary, it is exactly why the contract should be enforced as written.

10        Nor can Plaintiff invalidate the claims process on the grounds that claims must be

11   submitted to Google within 60 days (SAC ¶ 81). Any such argument is contrary to established

12   case law. In *Feldman v. Google*, which involved virtually identical claims to this case, the court

13   held that the AdWords Agreement—including the provision "requiring that claims relating to

14   charges be brought within sixty days of the charges"—was fair and enforceable. 513 F. Supp. 2d

15   229, 243 (E.D. Pa. 2007). The court specifically explained that this provision "affords

16   [advertisers] sufficient time to identify, investigate, and report billing errors." *Id*. As described

17   above, moreover, in *Free Range Content* this Court upheld and enforced an even shorter 30-day

18   claim period in Google's AdSense Agreement. 2016 U.S. Dist. LEXIS 64365, at *39.

19        In short, Plaintiff cannot avoid the unambiguous effect of the contractual waiver that he

20   agreed to when he signed up for his AdWords account. Under the clear terms of that provision,

21   any claims for advertising charges that Plaintiff did not submit to Google with a request for ad

22   credits within 60 days of the relevant invoice are waived.

23        **B.    Plaintiff Cannot State A Claim for Breach of the Implied Covenant**

24        Even without regard to the waiver provision, all of the claims asserted in the SAC fail of

25   their own accord and should be dismissed under Rule 12(b)(6). The SAC abandons Plaintiff's

26   prior claim for breach of contract, but continues to allege that Google breached the implied

27   covenant of good faith and fair dealing in the AdWords Agreement because Google supposedly

28   did not do enough to protect Plaintiff from fraudulent or invalid clicks. SAC ¶¶ 99-100. An

1  invocation of the implied covenant of good faith fails here for two reasons. First, there is no

2  underlying promise in the AdWords Agreement that Plaintiff would be protected from all

3  instances of invalid clicks, and Plaintiff's bid to use the implied covenant to rewrite the contract

4  to impose a broad protective duty—one that is not even possible—on Google is legally improper.

5  Second, the SAC makes no plausible allegation that Google acted in bad faith to deprive Plaintiff

6  of any benefit that he could reasonably have expected under the terms of the Agreement.

7           1.   <u>Plaintiff cannot use the implied covenant to rewrite the parties' Agreement</u>

8                <u>regarding fraudulent clicks</u>

9           The purpose of the implied covenant of good faith and fair dealing is to prevent

10  contracting parties from acting to injure one another's rights to receive the intended benefits of

11  their agreement. To invoke it, as this Court has recognized, the plaintiff must show that "the

12  defendant deprived the plaintiff of a benefit conferred by the contract in violation of the parties'

13  expectations at the time of contracting." *Free Range Content*, 2016 U.S. Dist. LEXIS 64365, at

14  *40 (citation and internal quotations omitted); *see also Avila v. Countrywide Home Loans*, 2010

15  U.S. Dist. LEXIS 133701, at *13 (N.D. Cal. Dec. 7, 2010) (plaintiff must show the defendant

16  "deprived him of a benefit actually conferred or contemplated by the contract"); *Agosta v. Astor*,

17  15 Cal. Rptr. 3d 565, 572-73 (Cal. Ct. App. 2004) (same).

18           This means that a claim for breach of the implied covenant must always be tied to the

19  "express covenants or promises of the contract." *Carma Developers, Inc. v. Marathon Dev. Cal.,*

20  *Inc.*, 826 P.2d 710, 727 (Cal. 1992). It "cannot impose substantive duties or limits on the

21  contracting parties beyond those incorporated in the specific terms of their agreement."

22  *Damabeh v. 7-Eleven, Inc.*, 2013 U.S. Dist. LEXIS 66565, at *18 (N.D. Cal. May 8, 2013)

23  (quotation marks omitted). Yet that is precisely what Plaintiff seeks to do here. He would read

24  into the AdWords Agreement an expansive obligation on Google's part to detect and prevent all

25  fraudulent clicks. This effort fails as a matter of law.

26           Plaintiff alleges that he "contracted for the benefit of being charged only for legitimate

27  clicks." SAC ¶ 97. But the AdWords Agreement contains no promise that Google will protect

28  advertisers from all (or some quantum of) invalid clicks. To the contrary, the Agreement

1   expressly puts advertisers on notice that they may experience such clicks. Section 7 says

2   expressly, and secures the advertiser's specific understanding, that "third parties may generate

3   impressions or clicks on Customer's Ads for prohibited or improper purposes." Ex. 1 § 7.

4   Reinforcing this language, Section 8 of the Agreement contains an express disclaimer: "NONE

5   OF GOOGLE, ITS AFFILIATES OR GOOGLE'S PARTNERS MAKE ANY GUARANTEE

6   IN CONNECTION WITH THE [ADVERTISING] PROGRAMS OR PROGRAM RESULTS."

7   This tells advertisers that they take the AdWords program "as is" and that there are no guarantees

8   that they will be protected from every instance in which third parties might try to misuse

9   Google's advertising systems.

10      Given these clear contractual terms, it is not surprising that Plaintiff fails to identify any

11   language in the AdWords Agreement that supports his claim. Plaintiff cryptically alleges that

12   "Google is disregarding its measurements to determine the total charges for such clicks." SAC

13   ¶ 100. This may be intended as a reference to Section 7, which says that "Charges are solely

14   based on Google's measurements for the Programs and the applicable billing metrics (e.g., clicks

15   or impressions)." Ex. 1 § 7. But this provision does not help Plaintiff's claim. It does not say that

16   invalid clicks will always be detected and never billed to advertisers. The whole point of the

17   sentence is to make clear that Google is the party with the exclusive right to determine how

18   advertising charges should be measured. If those charges include clicks that Google's filters did

19   not register as fraudulent, those charges are based on "Google's measurements." Of course,

20   advertisers have recourse in that scenario: they are free to submit a claim to Google and receive

21   credits for any charges determined to be invalid. *Id*. But they cannot assert, as Plaintiff attempts

22   to do here, that Google has somehow contracted to stop all invalid clicks before they happen or

23   to exclude all charges resulting from such clicks from ever being billed.

24      Instead, the text of the parties' Agreement told Plaintiff that his account might be charged

25   for clicks that third parties generated for improper purposes and that Google was making no

26   promises in that regard. This express contractual understanding belies any suggestion that

27   Plaintiff was contracting for the benefit of being protected from all charges that might result

28   from fraudulent or invalid clicks.

1    Because Google did not make any promise to stop all click fraud, there is no basis for

2    Plaintiff to assert that Google failed to carry out that supposed obligation in good faith. That

3    defeats any claim for breach of the implied covenant. Plaintiff cannot use the covenant to

4    "rewrite" the parties' contract "to include provisions entirely foreign to and expressly negated by

5    the original." *Tollefson v. Roman Catholic Bishop*, 268 Cal. Rptr. 550, 556 (Cal. Ct. App. 1990)

6    (disapproved on other grounds); *see also Nkwuo v. MetroPCS, Inc.*, 2015 U.S. Dist. LEXIS

7    111206, at *3-4 (N.D. Cal. Aug. 21, 2015) (dismissing implied covenant claim where the

8    "express terms of the [] contract … specifically permit[ted] the conduct [plaintiff] finds

9    objectionable"). Plaintiff's claim suffers from the same defect that Judge Fogel identified in

10   dismissing a virtually identical claim in *Woods*: "Woods has failed to allege that Google

11   undertook a specific duty that it failed to discharge." *Woods v. Google, Inc.*, 2011 U.S. Dist.

12   LEXIS 88795, at *20 (N.D. Cal. Aug. 10, 2011).

13                  2.      Plaintiff does not plausibly allege that Google's actions regarding click

14                          fraud were unreasonable or done in bad faith

15                  Beyond trying to read a non-existent promise into the parties' contract, Plaintiff's claim

16   fails because there are no plausible allegations that Google acted in bad faith with respect to any

17   promise in the Agreement. Allegations supporting a claim for breach of the implied covenant

18   "must show that the conduct of the defendant . . . demonstrates a failure or refusal to discharge

19   contractual responsibilities, prompted not by an honest mistake, bad judgment or negligence *but

20   rather by a conscious and deliberate act*, which unfairly frustrates the agreed common purposes

21   and disappoints the reasonable expectations of the other party." *Careau & Co. v. Sec. Pac. Bus.

22   Credit*, 272 Cal. Rptr. 387, 399-400 (Cal. Ct. App. 1990) (emphasis added). Applying this rule in

23   *Free Range,* this Court dismissed a claim by AdSense publishers alleging Google breached the

24   implied covenant by selectively terminating them. The Court held these bald allegations were

25   "not enough to plead bad faith." *Free Range*, 2016 U.S. Dist. LEXIS 64365, at *46.

26                  Plaintiff's claim here fails for the same reason. Plaintiff alleges that Google charged

27   advertisers for clicks that it "knew or should have known" were invalid. SAC ¶ 99. This

28   barebones assertion does not state a claim. To the extent Plaintiff is trying to suggest *actual*

1   knowledge, his allegations are entirely conclusory. The SAC does not offer a single factual

2   allegation that would suggest, much less plausibly support, that Google knew that certain charges

3   to Plaintiff's account (or indeed any advertiser's) were based on invalid clicks yet charged for

4   those clicks anyway. Plaintiff certainly identifies no actual instance when that supposedly

5   happened. The SAC's conclusory allegation is not enough to establish a lack of good faith.

6        Because it is clear that Plaintiff has no basis for alleging actual knowledge, he suggests

7   that Google "should have known" or "turned a blind eye" (SAC ¶ 99). But this is merely another

8   way of arguing that Google might have taken additional steps that Plaintiff speculates might have

9   better protected advertisers from the possibility of click fraud. That is not enough to support a

10   claim for breach of the implied covenant. Plaintiff's allegations do not establish that Google

11   engaged in any "conscious [or] deliberate act" (*Careau & Co.*, 272 Cal. Rptr. at 399) to saddle

12   Plaintiff with improper advertising charges. Indeed, the only basis for Plaintiff's constructive

13   knowledge allegation is that Google did not use its Search Quality Raters Guidelines as part of

14   its AdWords click fraud detection efforts. SAC ¶ 99. This argument defeats itself. As Plaintiff

15   acknowledges, Google's SQR Guidelines were not designed to be used in connection with

16   AdWords or to detect or prevent advertising-related click fraud. Their purpose is different: "to

17   ensure the value of organic searches through the Google website and to protect individual users

18   from webpages the Guidelines have identified as potentially dangerous and/or irrelevant." *Id.*

19   ¶¶ 52-53. Plaintiff's reliance on these irrelevant Guidelines only highlights how implausible his

20   claim is. The fact that Google maintains certain measurements for subjectively assessing the

21   quality of third-party websites that appear in organic search results does not mean that Google

22   acts in bad faith by not using those measurements for the unrelated purpose of preventing

23   advertising click fraud in connection with a different Google service. Unsurprisingly, Plaintiff

24   does not allege that the SQR Guidelines would be useful for this purpose or that using them in

25   this novel way would actually have prevented invalid charges on his AdWords account. *Id.* ¶ 54.[6]

26   _____

27   [6] Any such allegation would be entirely implausible. Plaintiff's position seems to be that
Google should restrict AdWords ads from appearing on websites that the SQR Guidelines
determined are of "low quality" for search users. SAC ¶¶ 52-54. Plaintiff offers no reason for

28   believing that taking this step would actually reduce incidents of click fraud, and that suggestion
makes little sense on its face. In any event, Plaintiff does not allege that any of *his* AdWords ads
(continued...)

1      In short, Plaintiff cannot point to unrelated Google tools and assert that Google breached

2  the parties' Agreement by failing to use those tools for a purpose for which they were not

3  designed and for which there is no basis to suggest that they would be beneficial. The implied

4  covenant of good faith and fair dealing does not allow Plaintiff to impose a broad obligation on

5  Google—one contemplated nowhere in the parties' actual agreement—to take whatever steps he

6  imagines (however fancifully or abstractly) might prevent wrongdoing by third parties.

7  Plaintiff's claim fails as a matter of law.

8      **C.      Plaintiff Fails To State A Claim Under The UCL**

9      The SAC fares no better when it turns to Plaintiff's statutory claims. To bring a claim

10 under the UCL, Plaintiff must show that he lost money or property as a result of an unlawful,

11 unfair, or fraudulent business practice. Cal. Bus. & Prof. Code §§ 17200, 17204. While Plaintiff

12 claims to have suffered an injury in the form of overcharges for invalid clicks, his complaint fails

13 to identify any actual charges for clicks that he believes to be invalid. But even if Plaintiff had

14 offered such allegations, his UCL claim fails because Plaintiff cannot establish that Google

15 committed any unlawful, unfair, or fraudulent practices in connection with its AdWords billing.

16      1.    Plaintiff cannot state a claim under the "unlawful" prong

17     Plaintiff's invocation of the UCL's unlawfulness prong relies solely on the claim that

18 Google breached the implied covenant of good faith in the parties' contract. SAC ¶ 110. It is well

19 settled, however, that "a breach of the implied covenant of good faith and fair dealing, is not

20 itself an unlawful act for purposes of the UCL." *Boland v. Rolf C. Hagen (USA) Corp.*, 685 F.

21 Supp. 2d 1094, 1110 (E.D. Cal. 2010); *see also Sybersound Records, Inc. v. UAV Corp.*, 517

22 F.3d 1137, 1152 (9th Cir. 2008). Here, Plaintiff has not pleaded, and could not plead, that

23 Google engaged in any unlawful conduct distinct from the alleged (and non-existent) breach of

24

25      (...continued from previous page)

26 ever appeared on such low quality websites or even that such websites are part of the Google
Display Network where his ads ran. *Id*. ¶¶ 57-58 (Plaintiff used AdWords for "highly-targeted

27 marketing"); *accord id*. ¶ 12 (Plaintiff sought to use AdWords "to provide cost-effective,
targeted pay-per-click advertising on high-quality websites"). Plaintiff's inability to allege that

28 he was affected in any way by how Google uses its SQR Guidelines is further reason not to allow
him to base a claim on this contrived theory.

1  the implied covenant in the AdWords Agreement. His unlawfulness theory therefore cannot

2  stand. *See, e.g., Ford v. Lehman Bros. Bank, FSB*, 2012 U.S. Dist. LEXIS 85600, at *28-30

3  (N.D. Cal. June 20, 2012) (dismissing unlawfulness claim where "[p]laintiff fails to demonstrate

4  how the facts alleged to support breach are, apart from breach, wrongful").

5              2.        Plaintiff cannot state a claim under the "unfairness" prong

6          Since the California Supreme Court's decision in *Cel-Tech Communications, Inc. v. Los*

7  *Angeles Cellular Telephone Co.*, 973 P.2d 527 (Cal. 1999), courts have divided over whether to

8  apply the test enunciated in that case, a modified "balancing test," or a three-part FTC test to

9  UCL unfairness claims such as this. *See generally Davis v. HSBC Bank Nevada*, 691 F.3d 1152,

10  1169-70 (9th Cir. 2012). Here, Plaintiff's claim fails under any of these tests.

11         The *Cel-Tech* standard requires "conduct that threatens an incipient violation of an

12  antitrust law, or violates the policy or spirit of one of those laws because its effects are

13  comparable to or the same as a violation of the law, or otherwise significantly threatens or harms

14  competition." 973 P.2d at 544. There is nothing remotely like that here. The Second Amended

15  Complaint offers no factual allegations that Google's billing practices violate the letter, policy,

16  or spirit of the antitrust laws, or that they harm competition.

17         Under the FTC test, conduct is "unfair" "if the consumer injury is substantial, is not

18  outweighed by any countervailing benefits to consumers or to competition, and is not an injury

19  the consumers themselves could reasonably have avoided." *Daugherty v. Am. Honda Motor Co.*,

20  51 Cal. Rptr. 3d 118, 129 (Cal. Ct. App. 2006). Here, Plaintiff alleges no substantial injury;

21  indeed, he points to no instances where he was ever actually charged for invalid clicks. And of

22  course, he could well have avoided any injury by using the contractual claims process to bring to

23  Google's attention in a timely manner specific charges that may have resulted from fraudulent or

24  invalid clicks. But, as discussed above, Plaintiff does not allege that he did so at any time after

25  "early 2016," when he "began to suspect his GDN-based PPC advertisements were being

26  fraudulently manipulated by third-party publishers/website owners." SAC ¶ 60.

27         Finally, under the balancing test, a practice is "unfair" when it "'offends an established

28  public policy or when the practice is immoral, unethical, oppressive, unscrupulous or

1    substantially injurious to consumers.'" *South Bay Chevrolet v. General Motors Acceptance*

2    *Corp.*, 85 Cal. Rptr. 2d 301, 316 (Cal. Ct. App. 1999) (citation omitted). Here, however, Plaintiff

3    does not plausibly allege that Google's policies regarding click fraud meet that standard. Nor

4    could he. As explained above, the materials in or incorporated into the SAC make clear that

5    Google warns advertisers about the possibility of click fraud and takes steps to protect them from

6    invalid clicks, often before they are charged for them. *See* Ex. 3 at 3-4. Likewise, for any invalid

7    clicks that those proactive filters may miss, Google has a process allowing advertisers to recover

8    credits for charges that may result. Ex. 1 § 7. Google's actions in this regard are not contrary to

9    public policy, immoral, unethical, oppressive, or unscrupulous.

10     This case is similar to *Davis*. There, the plaintiff alleged a credit card company's

11   practices were unfair because its advertisements said that new credit card holders would receive

12   $25 the first time they used their credit card, but did not disclose there was a $59 annual fee.

13   *Davis*, 691 F.3d at 1158. The Ninth Circuit affirmed the dismissal of that claim because the

14   advertisements stated that other restrictions might apply, the application process disclosed the

15   annual fee, and the plaintiff could have avoided any injury by closing his credit card within 90

16   days. *Id.* at 1170-71. Likewise here, Google clearly discloses the risk of click fraud in the

17   AdWords Agreement (and elsewhere) and provides a simple process that allows advertisers to

18   receive compensation for charges related to invalid clicks. As in *Davis*, Plaintiff's conclusory

19   allegations are inadequate to support the claim that Google acted unfairly under the UCL.

20        3.  <u>Plaintiff cannot state a claim under the fraud prong</u>

21     Finally, Plaintiff's claim under the UCL's fraud prong is based on allegedly false and

22   deceptive statements on Google's online Ad Traffic Quality Resource Center, AdWords Help

23   Center, and Inside AdWords blog regarding Google's practices for addressing click fraud and

24   invalid clicks. SAC ¶¶ 110-111. Plaintiff alleges that these extra-contractual statements induced

25   him to use (or to continue to use) the AdWords program. *Id*. ¶ 112. This claim fails for two

26   fundamental reasons. First, Plaintiff fails to plausibly allege that the statements at issue were

27   false or deceptive. Second, as a matter of law, Plaintiff could not have reasonably relied on those

28

1   statements because the AdWords Agreement that he accepted when he signed up and used the

2   AdWords program clearly discloses and disclaims all risks related to click fraud.

3             a.    <u>Plaintiff cannot allege that the statements he claims to have relied</u>

4                   <u>on were actually false or deceptive</u>

5             To state a claim under the fraud prong, "Plaintiff[] must allege specific facts to show that

6   members of the public are likely to be deceived" by the statements at issue. *In re Google Privacy*

7   *Policy Litig.*, 2013 U.S Dist. LEXIS 171124, at *44-45 (N.D. Cal. Dec. 3, 2013); *accord Fazio v.*

8   *Apple, Inc.*, 637 F. App'x 415, 415-16 (9th Cir. 2016). Because Fed. R. Civ. P. 9(b) applies to

9   these claims (*see Kearns v. Ford Motor Co.*, 567 F.3d 1120, 1124-25 (9th Cir. 2009)), the

10  complaint must include particularized allegations showing how the statements were fraudulent.

11  *See Oestreicher v. Alienware Corp.*, 544 F. Supp. 2d 964, 968 (N.D. Cal. 2008) ("plaintiffs

12  seeking to satisfy Rule 9(b) must 'set forth an explanation as to why the statement or omission

13  complained of was false and misleading'" (citation omitted)). Moreover, "[g]eneralized, vague,

14  and unspecified assertions constitute mere puffery upon which a reasonable consumer could not

15  rely, and hence are not actionable." *Glen Holly Entm't v. Tektronix Inc.*, 343 F.3d 1000, 1015

16  (9th Cir. 2003); *accord Oestreicher*, 544 F. Supp. 2d at 973-74 (dismissing UCL claim based on

17  "non-actionable puffery").

18            Plaintiff cannot meet these standards here. The SAC identifies a series of statements from

19  online help pages that discuss Google's practices regarding the AdWords program, including

20  Google's efforts to prevent click fraud. SAC ¶ 110. But Plaintiff fails to plausibly allege that any

21  of these statements is fraudulent. Take, for example, the statement that "[o]n average, invalid

22  clicks account for less than 10% of all clicks." Ex. 3 at 2. By its terms, this statement simply

23  describes Google's historical experience across the AdWords platform. It says that the invalid

24  clicks detected by Google's systems, on average, account for less than 10% of overall clicks.

25  That statement is true, and the SAC offers no plausible basis for believing otherwise. Plaintiff

26  pleads nothing to suggest that Google has actually measured invalid clicks across AdWords at

27  some greater rate. Instead, Plaintiff distorts Google's words. When referencing the statement in

28  Paragraph 110, the SAC omits the phrase "on average." But that phrase confirms that the

statement says nothing about the percentage of invalid clicks Google might detect for any given advertiser or any given campaign.

Google makes that point expressly on another page referenced in the SAC, which explains the 10% figure in detail. SAC ¶ 82 & n.24 (referencing Ex. 5). Those materials explain the 10% figure represents the rate of clicks detected as invalid by Google's proactive systems and that this rate "has remained in the range of less than 10% of all clicks every quarter since we launched AdWords in 2002." Ex. 5 at 4. Moreover, Google makes clear that this rate is "network-wide": "[i]t is important to understand that the network-wide invalid clicks rate is separate from an individual advertiser's invalid clicks rate. … Thus, the overall invalid clicks rate, as well as its day-to-day fluctuations, *has almost no relation to the invalid clicks rate for an individual advertiser*." Ex. 5 at 5-6 (emphasis added). Google's explanations belie any claim of fraud. Google makes clear what it means (and does not mean) with the 10% figure. Thus, even assuming that Plaintiff's admittedly "unsophisticated" "experiments" (SAC ¶¶ 56-72), had any validity on their own terms, which they do not,[7] they are irrelevant here. Plaintiff's crude anecdotal tests in connection with two fictitious advertising campaigns say absolutely nothing about the rate of invalid clicks across the AdWords platform. They cast no doubt on Google's 10% statement and cannot form the predicate for a fraud claim.

Likewise, Plaintiff pleads no facts to suggest that any of the other statements referenced in paragraph 110 of the SAC are false or misleading:

- **"When Google determines that clicks are invalid, we try to automatically filter them from your reports and payments so that you're not charged for those clicks."** This statement describes Google's efforts to remove charges when it determines that clicks are invalid. It is a true statement, and no facts alleged in the SAC are to the contrary. As discussed above, Plaintiff cannot and does not point to any instance in which Google actually determined that certain clicks were invalid but proceeded to charge Plaintiff (or any other advertiser) for those clicks.

---

[7] Plaintiff's assumption that all clicks on the so-called "Experimental" ads are necessarily the product of click fraud (SAC ¶¶ 68, 71) is unsupported and facially implausible. The Experimental ads were not gibberish (*id*. ¶¶ 66, 70), and there is no reason to believe that every click on those ads was invalid (rather than reflecting genuine curiosity or interest about text that said things like "Get the facts today" and "we'll take your left over B-tonis and produce nice designs"). The idea that the "experiments" suggest a click fraud rate of 35-50% is baseless.

- **"The relationship between Google, advertisers, and publishers is built on trust..."** This is an (obvious) observation about the advertising ecosystem as it relates to the AdWords program. The SAC pleads nothing to suggest that the relationship between Google and its advertisers is not based on trust or that Google does not believe that it is so. This statement is not deceptive. Indeed, it is not a factual statement at all, but a clear example of "non-actionable puffery." *Oestreicher*, 544 F. Supp. 2d at 973-74. Either way, it cannot support a fraud claim.

- Google has a **"global team which is dedicated to … monitoring traffic across Google's ad network, and preventing advertisers from paying for invalid traffic."** Like the others discussed, this statement is true, and nothing in the SAC says otherwise. Plaintiff does not allege any facts to suggest that Google does not have a global team focused on ad traffic or that this team does not work to prevent advertisers from being charged for invalid clicks.

- **"The vast majority of all invalid clicks on AdWords ads are caught by our online filters. These filters are constantly being updated and react to a wide variety of traffic patterns and indications of click fraud attacks."** This statement simply says that most of the clicks Google suspects are not the result of genuine user interest are caught by its filters (as opposed to Google's manual investigations process) and that Google updates those filters to make them better. This statement, like the one above, reports Google's experience across the entire AdWords platform. Here, again, Plaintiff cannot point to a single factual allegation in the SAC that indicates that this statement is false.

- Investigations prompted by customer inquiries are **"relatively rare"** and such investigations identify invalid clicks representing **less than .02% of all clicks.** Plaintiff has misrepresented the statement it purports to quote. What the statement actually says is: "Because of the broad operation of our proactive detection, the relatively rare cases we find of advertisers being affected by undetected click fraud constitute less than 0.02% of all clicks." Ex. 5 at 4-5. Google does not say that investigations are rare; it says that "[Google's] Click Quality team investigates *every* inquiry we receive from advertisers who believe they may have been affected by undetected click fraud." *Id*. at 4.(emphasis added). As for the second part of the statement— that click fraud identified through reactive investigations constitutes 0.02% of all clicks—nothing in the SAC suggests that this is untrue (i.e., that the number of invalid clicks uncovered by Google's investigations is more than 0.02% of the total number of clicks across AdWords.

In short, Plaintiff has no fraud claim because he has not plausibly alleged that any of the statements he seeks to put at issue were false or deceptive. To the contrary, these statements, to the extent they are even statements of fact, are accurate descriptions of Google's experience and practices regarding click fraud. They are not statements that would cause members of the public to be deceived. *See, e.g.*, *Cullen v. Netflix, Inc.*, 2013 U.S. Dist. LEXIS 4246, at *16-21 (N.D.

1    Cal. Jan. 10, 2013) (dismissing UCL claim where plaintiff failed to allege sufficient facts to

2    show that statements at issue were false).[8]

3              b.     As a matter of law, Plaintiff could not have reasonably relied on

4                     any of the extra-contractual statements at issue

5          Even if Plaintiff could somehow overcome this problem, his fraud claim still would fail.

6    To proceed under the fraud prong, the "[p]laintiff must show that he personally lost money or

7    property because of his own *actual and reasonable reliance* on the allegedly untrue or

8    misleading statements." *Rosado v. eBay, Inc.*, 53 F. Supp. 3d 1256, 1264-65 (N.D. Cal. 2014)

9    (emphasis added). Plaintiff cannot make that showing because the language of the AdWords

10   Agreement precludes him from having reasonably relied on extra-contractual statements.

11         Where a contract includes express disclosures and disclaimers, someone bound by that

12   contract cannot allege reasonable reliance on extra-contractual statements. *See, e.g.*, *Janda v. T-*

13   *Mobile, USA, Inc.*, 2009 U.S. Dist. LEXIS 24395, at *26-28 (N.D. Cal. Mar. 13, 2009)

14   (dismissing UCL fraud claim where defendant made unambiguous disclosures in service

15   agreements); *Spiegler v. Home Depot U.S.A., Inc.*, 552 F. Supp. 2d 1036, 1047-48 (C.D. Cal.

16   2008) (dismissing UCL fraud claim in light of an unambiguous contract). That is the situation

17   here. As discussed, the AdWords Agreement expressly put Plaintiff on notice that "third parties

18   may generate impressions or clicks on [his] Ads for prohibited or improper purposes" and he

19   may be charged for such clicks, which are to be resolved through Google's claims process. Ex. 1

20   § 7. The Agreement also unequivocally disclaims any extra-contractual guarantees related to

21   AdWords and includes an express integration clause. *Id.* §§ 8, 12. These provisions foreclose

22   Plaintiff as a matter of law from establishing that he reasonably relied on any statements outside

23   the Agreement. *Accord Guido v. Koopman*, 2 Cal. Rptr. 2d 437, 440 (Cal. Ct. App. 1991)

24

25         [8] Plaintiff also hints at a fraudulent concealment theory based on Google's purported failure
26   to disclose that it would not protect advertisers from invalid clicks. SAC ¶ 115. Any such claim
     fails because Google made clear invalid clicks could occur and advertisers could recover charges
27   for such clicks by using the claims process set out in the AdWords Agreement. Plaintiff again
     references Google's SQR Guidelines, but once again he does not, and cannot, explain how
28   Google's decision not to use unrelated search metrics as part of its click fraud efforts on the
     separate AdWords service could possibly rise to the level of "fraud." *See supra* n.3.

1   ("[W]hether a party's reliance was justified may be decided as a matter of law if reasonable

2   minds can come to only one conclusion based on the facts.").

3         Two cases are squarely on point. In *Woods*, Judge Fogel dismissed an almost identical

4   UCL claim premised on Google's extra-contractual statements about invalid clicks because

5   "Woods does not explain how Google's use of the AdWords Help Center to explain its program

6   to advertisers prevented him from understanding the clear language in the Agreement excluding

7   any reliance on extraneous statements or promises." *Woods*, 2011 U.S. Dist. LEXIS 88795, at

8   *26. Likewise, in *In re Facebook PPC Advertising Litigation*, 2010 U.S. Dist. LEXIS 136505

9   (N.D. Cal. Dec. 15, 2010), the court rejected a similar UCL claim brought by Facebook

10   advertisers alleging that a statement on Facebook's Advertising Help Center about the

11   company's efforts to prevent charges for click fraud was false and misleading. The court pointed

12   to the terms of the governing agreement, which disclosed that click fraud could occur and

13   disclaimed Facebook's liability. *Id*. at *20. In light of those provisions, the court held that the

14   plaintiffs could not reasonably have relied on the help center statement as a guarantee that

15   Facebook's filtering efforts would always be effective. *Id*. at *27-28.

16         So too here, the AdWords Agreement renders unreasonable any purported reliance on

17   statements outside the contract. No reasonable person reviewing Google's Help Center

18   statements in light of the Agreement could read them as saying that advertisers would be

19   protected from some quantity of invalid clicks. And to the extent Plaintiff somehow believed

20   otherwise, that does not amount to the reasonable reliance needed for a fraud claim.

21         **D.**    **Plaintiff's Other Fraud Claims Fail For The Same Reasons As His UCL Claim**

22         Plaintiff asserts a claim under the FAL (Cal. Bus. & Prof. Code § 17500). SAC ¶ 125.

23   This claim duplicates his claim under the UCL's fraud prong and fails for the same reasons:

24   Plaintiff alleges no facts showing that Google's statements were false or misleading, and he

25   cannot demonstrate he relied on any such statements in light of the clear terms of the AdWords

26   Agreement. *See, e.g.*, *Williamson v. Reinalt-Thomas Corp.*, 2012 U.S. Dist. LEXIS 58639, at

27   *21-22 (N.D. Cal. Apr. 25, 2012) (requiring reasonable reliance for claim under FAL); *Davis*,

28   691 F.3d at 1169 (applying same standards to dismiss claim under FAL and UCL's fraud prong).

The same is true of Plaintiff's newly minted fraudulent inducement claim. *See Lazar v. Superior Court*, 909 P.2d 981, 984 (Cal. 1996). This claim is based on the same allegation of misleading statements or omissions discussed above in connection with the UCL claim. SAC ¶ 133. And it fails for the same reasons: Plaintiff alleges no facts to establish that the statements at issue were false or deceptive, and in light of the clear language of the AdWords Agreement (and the other materials referenced in the SAC), Plaintiff could not have justifiably relied on those statements. *See, e.g.*, *Worley v. Avanquest North Am., Inc.*, 2013 U.S. Dist. LEXIS 16239, at *16 (N.D. Cal. Feb. 5, 2013) (holding that plaintiff's UCL and fraudulent inducement claims fail "for the same reasons ... *i.e.*, because he has not pled with sufficient specificity allegations regarding the falsity of defendant's representations"); *Benefield v. Bryco Funding, Inc.*, 2014 U.S. Dist. LEXIS 113129, at *11 (N.D. Cal. Aug. 14, 2014) (dismissing fraudulent inducement claim where "plaintiffs have not alleged facts supporting the elements of fraud").

Nor has Plaintiff properly alleged that Google made the statements at issue with actual knowledge of their supposed falsity. Plaintiff's allegation in that regard (SAC ¶ 134) is pure boilerplate that simply recites this element of the claim without offering any supporting factual assertions. This is not sufficient under the applicable pleading requirements. *See Iqbal*, 556 U.S. at 678-79. "General averments of the defendants' knowledge of material falsity will not suffice. Consistent with Fed. R. Civ. P. 9(b), the complaint must set forth 'specific facts that make it reasonable to believe that defendants knew that a statement was materially false or misleading.'" *GIA-GMI, LLC v. Michener*, 2007 U.S. Dist. LEXIS 54031, at *26 (N.D. Cal. July 16, 2007) (quoting *Rhodes v. Omega Research, Inc.*, 38 F. Supp. 2d 1353, 1363 (S.D. Fla. 1999) (alterations omitted)). The SAC does not come close to doing that.

## IV.   CONCLUSION

For these reasons, Plaintiff's SAC fails to state any claim on which relief can be granted and should be dismissed without further leave to amend.

1  Dated:  January 18, 2017                    Respectfully submitted,

2                                              WILSON SONSINI GOODRICH & ROSATI
                                               Professional Corporation
3
                                               By:  /s/ Dale R. Bish
4                                                        Dale R. Bish

5                                              *Attorneys for Defendant*
                                               *Google Inc.*
6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28